[No. H028630. Sixth Dist. July 10, 2006.]

JORGE BUSTAMANTE, Plaintiff, Cross-defendant and Appellant, v. INTUIT, INC., Defendant, Cross-complainant and Respondent.

**COUNSEL**

Sonnett & Associates, Anthony E. Sonnett, Trevor J. Ingold; Godwin Gruber, David W. Holman, Michael K. Hurst and Hilaree A. Casada for Plaintiff, Cross-defendant and Appellant.

Fenwick & West, Rodger R. Cole, Laurence F. Pulgram and Rachael G. Samberg for Defendant, Cross-complainant and Respondent.

**OPINION**

**ELIA, J.**—Plaintiff Jorge Bustamante attempted to create a joint venture with defendant Intuit, Inc., in which they would market Intuit software adapted for users in Mexico. After their attempts to secure outside funding for the enterprise failed, Intuit stopped working with Bustamante toward their objective. Bustamante then brought this action for breach of contract and wrongful dissociation. The superior court, however, granted summary judgment to Intuit. Bustamante appeals, contending that the parties had an oral contract to establish a company in Mexico. Bustamante further challenges the order denying his motion to strike or tax costs claimed by Intuit.

Intuit maintains that any contract between them had to be in writing, both to satisfy the parties' expectations and to comply with the statute of frauds. Intuit further argues that the terms of the alleged oral contract were fatally uncertain. We agree with Intuit's second point and must therefore affirm the judgment.

### Background

Intuit develops and markets financial software for individuals and small businesses. One of its leading products is QuickBooks, which both parties

describe as "a software package that features consolidated accounting and other capabilities for small businesses." On October 31, 2001, Bustamante sent a proposal by e-mail to Raymond Stern, senior vice-president of strategy and chief marketing officer at Intuit. Bustamante told Stern that he had a "proven track record" introducing American technology products to Mexico, and that he had "many close friends" there who were senior executives or "top government officials." He suggested that there would be a good market in Mexico for QuickBooks and Quicken, but Quicken currently did not address the specific needs of the Mexican market. Bustamante proposed that he and Intuit either (1) "sign a licensing agreement" for his "group" to make a "strong monetary investment for marketing and developing" Intuit products and services or (2) establish a Mexican subsidiary of Intuit in which he would act as general manager.

Stern replied that the Mexican market was "not a priority" for Intuit at that time. Bustamante then suggested that if Intuit was currently busy pursuing other opportunities, a licensing agreement would be "a way into the market with no investment of time and no distraction of human resources for you." Stern's time commitment would thus be "limited to negotiating and signing a deal" with no monetary outlay by Intuit—a "win-win for everybody." After some discussions among Intuit executives, Bustamante was invited to meet with Stern and two members of his business development team, Fred Tinker and Dasha Grafil.

At that meeting, which took place on March 7, 2002, Bustamante offered his view of the market opportunity in Mexico. Tinker told him that if Intuit became interested, it would not have more than 20 percent ownership in the business. According to Bustamante, Tinker said, " 'Listen, if we would be interested, and I'm not saying that we are,' he made it clear, 'I'm not saying that we are at this initial meeting, if we would be interested in doing something, it . . . would not be more than 20 percent ownership for us . . . .' '[I]f we do this with you, it would be you as the entrepreneur, it would be us, and we'd have to get a third party here, preferably a venture capitalist or . . . a financial institution like a venture capitalist.' " Bustamante acknowledged at the meeting that he had not raised money before, but he estimated a 75 percent chance of succeeding.

In his deposition Bustamante stated that he told Stern at the March 7 meeting "that it was very important for me to have an agreement, that regardless of the decision that they made to go forward or not, that if they decided to go forward on this, it was very important for me to have an understanding so I wouldn't be left holding an empty bag at the end." According to Bustamante, Stern promised that "they would always treat [Bustamante] fairly" and "if they decided to go forward on this," they would

not "circumvent" him or "do this deal with anybody else." On his part Bustamante understood that he had promised to "pursue this with [his] best efforts." Bustamante did not think that the parties had agreed to any other terms at this point.

After the meeting, the parties developed a "phased approach" for their "evaluation" of the Mexico opportunity, consisting of several steps. The first three involved studying and working on the issues related to the products and the market. Most of these objectives were achieved, except for the "time-to-market" schedule, because the parties were unable to obtain the necessary funding for the "launch" of the project.

The final step in the first phase was "Make Decision to go Ahead." In Bustamante's mind, the parties already had a contract as of the March 7 meeting; but the decision whether to go forward was "confirmation" or an opportunity to "cancel" the contract. If Intuit decided to move to phase II, the contract would become "binding," "legal and technical," and "there was no way back for them."

On March 14, 2002, Bustamante received an e-mail from Grafil indicating that Intuit had decided to proceed to phase II. At this point the parties were still "exploring each other" and "investigating the market." Bustamante called phase II as it was understood on March 15 a plan to "find more information," a "negotiating period where we're going to gather information, and we're going to negotiate the things." They "hadn't even reached the point of assigning responsibilities or . . . of how we were going to do it and who was going to do it." Intuit had not yet checked his references. It was later, Bustamante explained, that they "agreed on terms under which [they] were going to work." Meanwhile, Intuit proceeded to "put together some high-level understanding of what we both wanted out of this arrangement, put together a time line, some dates, some steps, some responsibilities."

On April 2, 2002, an exchange of e-mail between Grafil and Bustamante reflected the parties' ongoing communication about their relationship. In discussing a nondisclosure agreement, Bustamante explained, "My goal is to partner with you and together bring Intuit to Mexico, and of course not be left ou[t]side at the end. I *understand very well that Intuit and I still have to negotiate many things in order to conclude this*." As for his concern that a third party might persuade Intuit to shut him out and instead hire a manager with no equity, Bustamante noted that Stern had assured him "that I should not worry and that Intuit would not go around me." Nevertheless, because Bustamante believed that his contribution was at that point "very intangible and subjective," he asked Grafil and Tinker for "a document saying that Intuit agrees not to circumvent me. However if it is a problem to have that

document I'm comfortable with your word. [¶] Again, if you can get me a document great!, if not let's move on and not drag and waist [*sic*] our precious time and energy on this."

Between April 7 and April 9, 2002, Bustamante and Tinker corresponded about their expectations of the Mexico project. Bustamante identified four general steps in the process: validating their initial assumptions through studies and a trip to Mexico; raising money; developing the business plan; and negotiating contracts between Intuit, Bustamante, and the venture capitalists. His understanding was that items two, three, and four related to phase II, following the decision to go forward with the plan. Tinker revised the outline Bustamante had sent, labeling the final category "Negotiate and finalize terms between [Bustamante], Intuit and [venture capitalists]." The last entry in this category was "Sign Contracts." Bustamante explained in his deposition that the process would result in written contracts that were not exclusive, as there could also be oral contracts. The contract between him and Intuit was "a separate thing" from the contracts between Intuit, the venture capitalists, and him.

On April 12, 2002, Tinker sent Grafil and Bustamante an e-mail (referred to by the parties as Exhibit 35), purporting to be a "summary" of what the parties had discussed. The first item listed was "Exclusivity." Tinker stated, "We do not need to go thru the motions to get this into a legal document. Our mutual understanding is that we are working together on a deal for Mexico. We do not intend to take your deal and work with anyone else in Mexico." The second item, "High level terms," included the following: for Bustamante, a minimum of 25 percent equity and a management position in the new company with $240,000 annual salary; a maximum of 19.9 percent equity from Intuit with no control but with management participation and a 20 percent royalty. The list also anticipated completion of a market study and a tentative plan to travel to Mexico in early to mid-May. Tinker prefaced this list with a request that Grafil and Bustamante review the summary and "edit/comment" if either of them saw "any issues."

To Bustamante, this e-mail appeared to be "confirming" the oral terms of the parties' "arrangement" on March 7. He testified in his deposition that he and Tinker had agreed to these terms before April 12. Upon "validat[ing] the market information [and] checking [him] out," however, Intuit had the "option to walk out of" the agreement they had reached. Tinker, on the other hand, regarded his summary as a clarification of the "understanding of what we both wanted. It was—at no point in time did we agree that this was something that was going to happen." Tinker stated that Bustamante and Intuit did not have an agreement that they would be working together on the deal for Mexico and that Intuit would not go into Mexico without him. His

understanding was that the phased approach would allow them to "see if there was an opportunity to work together in Mexico . . . . In no way, shape or form, did we ever agree, at the front end of the discussion, that we were going to do a deal in Mexico. We were going to do our homework first." According to Tinker, the parties never agreed to such a deal because they never obtained a funding commitment, which would have preceded an even bigger hurdle—a contract between Intuit, Bustamante, and the funding source.

On July 1, 2002, Tinker sent Bustamante an e-mail announcing that on June 28 Stern had agreed to "move to the next phase." Tinker then outlined the next steps: create a statement containing data Bustamante would need in approaching venture capitalists; evaluate QuickBooks to determine the requirements for the Mexico version; and determine whether it would be possible to secure the necessary funding for the project. Tinker added, "If you cannot secure funding we will need to look at alternative strategies."

Over the next few months Bustamante approached several venture capitalists by e-mail and conducted in-person presentations attended by Tinker. None responded favorably to the solicitation. In November 2002 Bustamante and Tinker discussed alternative funding strategies. Bustamante suggested a "targeted solicitation" to 100[1] firms, creation of an Intuit subsidiary in which Intuit would own 75 percent and Bustamante 25 percent, or a private investor fund raising effort with a reduced goal. As to the last, Bustamante believed he could raise an initial $1 million in Mexico, putting in the first $200,000 and obtaining $800,000 to $1.8 million from his friends and family. At that point, they could start selling the product, while continuing to work toward $2 million.

Tinker rejected the second idea pertaining to the subsidiary outright. The third option "might be doable" if the operation had initial funding of $2 million, not $1 million. Tinker emphasized that Intuit would not take any risks with less than "an exceptionally strong well funded operation." The first option, however, was a "no brainer," and Bustamante was encouraged to undertake the targeted solicitation "asap."

Bustamante urged Tinker to reconsider the $2 million figure. He offered to "do the numbers" to show Tinker that in Mexico $1 million would still allow for a "well funded" operation; but Tinker replied, "Jorge, no I do not want you to do the numbers. The answer is NO on a $1m. Let's move on."

---

[1] Bustamante testified in his deposition that in the letter he said 100, but he meant "a few hundred" firms.

None of Bustamante's November 2002 suggestions materialized. On November 26, 2002, Tinker advised Bustamante not to "blanket" the venture capitalists in the United States with a mass mailing, as Bustamante had proposed. Tinker added that the parties needed "to determine how much more time we want to chase funding. We suggest that if we cannot successfully secure funding in the next 3 months, we should move on. Let me know what you think."

Bustamante did not give up. He resisted the three-month limitation, but he nonetheless believed he could raise the necessary funds within that period. In mid-December he proposed three alternative scenarios which, to various degrees, reduced his salary, deferred Intuit's royalty, or reduced the investors' percentage of revenue receipts. None of these scenarios was ever agreed upon, however. Also unsettled were the terms of any software license renewal, a right of first refusal by Intuit to buy the company, and the "liquidity paths" for Bustamante and the investors—that is, the conditions and formula under which they could recoup their investments (such as by forcing Intuit to purchase their shares).

Bustamante told Tinker that the targeted e-mail would be subject to Tinker's approval. In responding to Tinker's suggestion that he not "blanket the VC's in the US," he expressed confidence that they would be able to "narrow the search" for venture capitalists, and he planned to discuss that strategy with Tinker after receiving the database. However, on January 8, 2003, Bustamante sent 700 to 900 firms an e-mail soliciting a $3 million investment in the Mexico project. One of the recipients, who happened to be an Intuit board member, forwarded the e-mail to Stern, who was angry. Stern found the mailing "unacceptable" and advised Grafil to coordinate with Tinker to "end this . . . and likely our relationship with [Bustamante]." On January 9, 2003, Tinker and Grafil informed Bustamante that "Intuit no longer would engage in discussions about the QuickBooks for Mexico concept." In his deposition Tinker stated that the termination of the parties' relationship was the product of "Intuit's frustration with Bustamante's inability to fulfill his promises to raise funds, as well as various other acts by Bustamante such as his e-mail solicitation sent to an unknown number of U.S. venture capitalists."

In late February 2003, after the termination of the parties' relationship, Intuit had "some discussions with a couple of individuals" regarding an Intuit opportunity in Mexico. However, Intuit did not thereafter develop any version of QuickBooks tailored to Mexico.

On September 16, 2003, Bustamante filed his complaint for breach of contract and wrongful dissociation. He alleged that he had an "agreement with Intuit to form and launch a company in Mexico to handle marketing and sales of Intuit products localized for the market in Mexico." Referring to the two-phase nature of their "cooperative venture," Bustamante alleged that the parties had agreed that at the end of phase I Intuit would make a firm decision about whether to proceed to phase II. According to Bustamante, both parties "understood and agreed that their commitment to proceed to the second phase would give rise to a mutual obligation to form and launch a company in Mexico."

That commitment, Bustamante alleged, was made in July 2002. Intuit "promised to use its best efforts to help form and launch 'Intuit Mexico.'" Subsequently each party assumed certain expenses and duties in the process, and "[c]ertain key details . . . as to how they intended to set up 'Intuit Mexico' were also negotiated and confirmed." Bustamante cited, for example, the terms granting him a 25 percent ownership, Intuit's maximum of 19.9 percent ownership, and Intuit's 20 percent royalty on sales. He generally noted that he would take on a role as a "salaried manager," and that the equity not held by Intuit or Bustamante "would remain available for private investors and for executive compensation." Bustamante added that the parties had "hoped that the bulk of the company's capitalization would come from outside investors," though they understood that "they might also rely on a number of different strategies to raise capital."

The complaint described the unsuccessful attempts by the parties to recruit investors in Mexico and then in the United States. In early January 2003, however, Intuit abruptly terminated their relationship, thereby breaching their agreement to "form and launch" the company in Mexico, and it later denied that they ever had such an agreement. The second cause of action for wrongful dissociation (Corp. Code, § 16602) again described the parties' relationship as a joint venture, from which Intuit had wrongfully withdrawn before completion of the undertaking.

Both parties moved for summary judgment or, alternatively, summary adjudication. Intuit asserted that breach of contract could not be established because 1) there was no meeting of the minds on the material terms of the alleged agreement and 2) if there was a contract, it was unenforceable because it was not in writing. As to the claim of wrongful dissociation, Intuit similarly asserted that the material terms for creating a joint venture were unsettled. It further argued that wrongful dissociation was impossible because the planned venture was never launched.

The superior court agreed. On December 7, 2004, the court granted summary judgment to Intuit, denied Bustamante's motion, and awarded costs to Intuit. Bustamante appeals from the ensuing judgment.

*Discussion*

The parties agree on the principles that govern our review of the summary judgment ruling. Summary judgment is proper when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) In reviewing an order granting summary judgment, we exercise our independent judgment, applying the same analysis as the trial court to determine "whether the moving party established undisputed facts that negate the opposing party's claim or state a complete defense." (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487 [59 Cal.Rptr.2d 20, 926 P.2d 1114]; see also *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

■ Intuit seeks to establish its entitlement to summary adjudication of Bustamante's contract claim by demonstrating that no enforceable contract was ever formed between the parties. Contract formation requires mutual consent, which cannot exist unless the parties "agree upon the same thing in the same sense." (Civ. Code, § 1580; see also §§ 1550, 1565.) "If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811 [71 Cal.Rptr.2d 265].) "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141 [127 Cal.Rptr.2d 145]; see also *Meyer v. Benko* (1976) 55 Cal.App.3d 937, 942–943 [127 Cal.Rptr. 846] [existence of mutual consent "is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe"].)

■ Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed. But if the material facts are certain or undisputed, the existence of a contract is a question for the court to decide. (*Robinson & Wilson, Inc. v. Stone* (1973) 35 Cal.App.3d 396, 407 [110 Cal.Rptr. 675].)

"Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached." (*Ersa Grae Corp. v. Fluor Corp.* (1991) 1 Cal.App.4th 613, 623 [2 Cal.Rptr.2d 288].) "To be enforceable, a promise must be definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 770 [23 Cal.Rptr.2d 810]; see also *Robinson & Wilson, Inc. v. Stone, supra*, 35 Cal.App.3d at p. 407.) "Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." (*Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 481 [289 P.2d 785]; see also Civ. Code, § 1598; *Ladas v. California State Auto. Assn., supra,* 19 Cal.App.4th at p. 770.) "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." (Rest.2d Contracts, § 33, subd. (2); accord, *Weddington Productions, Inc. v. Flick, supra,* 60 Cal.App.4th at p. 811.) But "[i]f . . . a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract." (*Weddington Productions, Inc. v. Flick, supra,* 60 Cal.App.4th at p. 811.)

According to Bustamante, the contract at issue consisted of a March 7, 2002 oral agreement and a set of additional terms listed in Exhibit 35, Tinker's April 12 e-mail. The March 7 terms were that Bustamante would pursue the venture with his best efforts, Intuit would treat Bustamante fairly, and Intuit would not "circumvent" him or "do this deal with anybody else." Exhibit 35 added contemplated figures for each party's equity percentage in the Mexico company, an equity reserve for the "management team," Bustamante's salary, and Intuit's 20 percent royalty. Added on July 1, 2002—the date Intuit allegedly became "firmly committed to seeing the deal through to completion"—was the agreement to "look at alternative strategies" in the event that Bustamante was unable to secure the necessary funding. Once phase II began, the parties became "obligated to find a way to make it work."

Bustamante maintains that summary judgment was erroneously reached because both Intuit and the superior court focused on the wrong agreements—that is, the anticipated agreements with third party investors, rather than the agreement between him and Intuit. The latter agreement—the subject of this lawsuit—"was simple and had certain terms: in order for Intuit or Bustamante to launch a Mexican company, they had to do so with one

another and they would take all steps necessary to obtain adequate funding and to formally launch the company. That agreement was not in writing, was not required or otherwise contemplated to be put in writing, and was wholly unrelated to the Parties['] efforts to obtain written agreements with third-party investors." It was, in essence, simply an agreement "to form and launch Intuit Mexico," by working "exclusively with each other and to continue working until the company was launched." Bustamante acknowledges that the parties never resolved the "specifics of whom [*sic*] the [venture capitalists] would be," the amount of Bustamante's salary or Intuit's royalty, the nature of the liquidity path, and the identity of the majority owner and source of control.[2] But these details, in Bustamante's view, were not essential to the agreement to launch the business; that is, they could remain "under discussion" while the parties' relationship "remained constant." Likewise, Bustamante contends, although contracts with third party investors were "integral to the success of the venture, they cannot be equated to the terms of the venture itself."

For purposes of this proceeding we will accept the premise that there are two separate agreements at issue. We nevertheless are unconvinced by Bustamante's position. Whether the alleged contract is viewed as a simple agreement "to form and launch" a company or as a composite of specific terms, the evidence reveals a lack of mutual consent to proceed with the project regardless of financing obstacles.

Describing the parties' mutual promises in the most general terms, Bustamante emphasizes the duty to "take all steps necessary to obtain adequate funding and to formally launch the company." But what steps are "necessary"? How can it be ascertained whether a party has complied with this term? How long were they required to continue seeking "adequate funding"? We cannot accept Bustamante's implied assertion that Intuit had to continue indefinitely to pursue an objective that had proved unsuccessful after six months. The conditions for performance are fatally uncertain.

In Tinker's April 12 e-mail he set forth the "mutual understanding" of the parties by acknowledging that they were "*working together* on a deal for Mexico." This communication does not permit a reasonable inference that Intuit intended at that point to be bound to help Bustamante establish the new business. Intuit made it clear, and Bustamante agreed, that the business would not be started without an initial investment of $2 to $3 million, most of which they contemplated obtaining from venture capitalists or private investors.[3] Accordingly, both understood that they could not (or would not) "form and launch" Intuit Mexico without first securing minimum financial commitments

---

[2] During their planning, the parties agreed that neither party wanted control of the prospective company.

[3] None of the capital was to have been contributed by Intuit.

from third parties. Those commitments in turn required the parties to execute contracts with investors. Thus, even if we agreed with Bustamante that he and Intuit could bind each other without first defining the *precise terms* of the third party contracts, there is no basis for inferring a promise by Intuit to support the project without having those contracts in place.[4] Whether viewed as an essential term of the parties' contract or a condition precedent to performance, the requirement of funding cannot be discounted as nonessential.[5]

The alleged agreement cannot withstand scrutiny even if it is considered as a composite of specific terms. First, rather than being definite, all of the following terms—which Bustamante represents as material—were actually unsettled both before and after the alleged commitment by Intuit: the form and amount of Bustamante's compensation; the extent, duration, and nature of his management role, if any; the amount of Intuit's royalty; the equity percentage held by him, "the management team," Intuit, and outside investors; and the liquidity path for both Bustamante and investors. Exhibit 35 itself makes it clear that the parties' relationship was still a subject of discussion on April 12: Tinker prefaced this e-mail by noting that it was a summary of what he and Bustamante had "discussed" and asking Bustamante and Grafil to "review and if there are any issues, feel free to edit/comment." On the subjects of salary and management Bustamante remained "very flexible" and "open to all possibilities." The royalty term was not clarified until August 2002—and even then it was incomplete[6]—and the parties never

---

[4] In his deposition Bustamante testified, "Intuit and I agreed to form this company, and what I mean by 'forming the company,' we agreed to take the product to Mexico, and we agreed that we would do it with somebody else's money. [¶] But at the end of the day the agreement was to take the products to Mexico after Intuit had had a period to validate what they were doing, validate the market, what would be the hurdle to raise money, as well as myself [*sic*]. . . ."

Bustamante attempted to explain the parties' expectations in the event that the fund-raising effort proved unsuccessful: They "would have had to have the flexibility to make this thing happen"—that is, "either Intuit would have had to agree to do it with less money [or] I would have had to agree, to continue raising the money for a longer period of time." According to Bustamante, the parties had "clearly agreed" to "deal with each other in good faith" in addressing any problems that arose, in order to meet their obligation to form the company. Instead, however, Intuit decided to "terminate" him without attempting to resolve the funding deficiency.

[5] According to Bustamante, the parties' agreement included a commitment to "look at alternative strategies" in the event that venture capitalists declined the investment opportunity. This assumption is derived from a statement by Tinker on July 1 completing his outline of the steps to be taken in phase II. The third step, in Tinker's view, was to "[d]etermine whether we can secure the funding that is necessary with enough resources to achieve our objectives in Mexico. If you cannot secure funding we will need to look at alternative strategies." This suggestion did not alter the parties' mutual understanding that there could be no company in Mexico without an initial third party funding commitment.

[6] On August 1, 2002, the parties exchanged e-mail regarding several unsettled matters. They cleared up a miscommunication about the 20 percent royalty, confirming that it was a percentage of sales, not operating expenses. Tinker advised Bustamante that the royalty was

decided how the liquidity path would be implemented. On the questions regarding management, Bustamante testified that he would have been satisfied with any scenario suggested to him as long as it "made economic sense" to him.

Second, the specific terms Bustamante contends were part of his contract with Intuit pertain to—and thus assume the existence of—a three-way relationship between Bustamante, Intuit, and investors. Without venture capitalists or private investors to help fund the business, the details of the operations were at most hypothetical scenarios. Not only did the parties contemplate further discussions between them, but both recognized that finalization of their relationship required *input from the investors*. According to Bustamante's deposition, the plans outlined on April 12 in Exhibit 35 remained subject to negotiation with the investors—i.e., the business plan, the amount of investment, the percentage of the venture capitalist's ownership,[7] "buy-out rights, liquidity, *whatever the venture capitalist felt [it was] important to negotiate*." (Italics added.) If the venture capitalists or Intuit decided that a $240,000 salary was unacceptable, it could be adjusted to as little as "$60,000 or 2 % of sales," and Tinker suggested that this detail, like the details of the royalty rate, could "be left open until all players have an opportunity to review and decide." Indeed, the flexibility Bustamante demonstrated with regard to management, salary, and ownership implies that his own commitment to launch Intuit Mexico was dependent in part on his agreeing to the conditions proposed or approved by the investors.

Thus, obtaining contractual business relationships with third parties was an essential condition that both parties understood was necessary in order to complete the negotiations and create a binding business relationship.[8] There could be no launch of Intuit Mexico without its formation, no formation without funding, and no funding without a commitment from venture capitalists or private investors. The failure of the parties' money-raising efforts meant that they were unable to create a working relationship with each other,

not expected to be reduced to 12 percent with higher sales, adding, "We may talk later about tiering royalty rate with higher sales, but it is too early for these discussions."

[7] In responding to Intuit's statement of undisputed facts, Bustamante did not contest the veracity of Intuit's assertion "that venture capitalist investors would negotiate the terms of their investment, including the amount of investment and percentage ownership interest, and that the amount that the venture capitalists would receive in ownership for the dollars that they invested was something that needed to be negotiated." Bustamante's only objection was that these terms were the subject of the anticipated third party contracts, which were separate from—and therefore "not material or relevant to—" the issues concerning the agreement he had with Intuit.

[8] In his deposition Bustamante conceded that the "agreement with Intuit on which [he was] suing in this action was an agreement that the parties would seek capital, including using a number of possible strategies, and with Bustamante taking the lead in contacting potential investors" with Intuit's help.

and consequently, no obligation arose or *could* arise to "form and launch" the company on any terms, general or specific.

Bustamante points to California cases in which contracts to launch companies were deemed sufficiently certain to be enforceable. Those cases are distinguishable. In *Holmes v. Lerner* (1999) 74 Cal.App.4th 442 [88 Cal.Rptr.2d 130], both parties clearly intended to proceed with the partnership. The plan to start a cosmetics company did not depend on obtaining financing, as Lerner had secured financing from the venture capital partnership of which she and her husband were limited partners. The company was eventually incorporated and the business became operational, but Holmes was deprived of a significant ownership interest and ultimately was asked to leave. The court upheld the jury verdict for Holmes on multiple causes of action, including breach of contract against Lerner. Construing the applicable provisions of the Uniform Partnership Act (Corp. Code, § 16100 et seq.), the appellate court held that "parties who expressly agree to associate as co-owners with the intent to carry on a business for profit, have established a partnership. Once the elements of that definition are established, other provisions of the UPA and the conduct of the parties supply the details of the agreement." (74 Cal.App.4th at p. 457.) Implied in the parties' agreement to operate the cosmetics company together was "an understanding to share in profits and losses as any business owners would." (*Ibid.*) The agreement was not too indefinite to be enforced, the court added, because both parties had manifested their mutual intent to take Holmes's idea and make it concrete by forming a company and engaging in the business together. (*Id.* at pp. 458–459.) Together with this agreement, the subsequent acts of the parties as they worked out the details provided sufficient certainty to determine the existence of a breach and a remedy. (*Id.* at p. 459.)

In this case, by contrast, the parties always understood that it would not be possible to "form and launch" Intuit Mexico without significant third party involvement in the enterprise. Clearly there was no expression of mutual consent to create a company without investor financing, which in turn could not be obtained without first ironing out the details of the contemplated network of relationships. Because essential terms were only sketched out, with their final form to be agreed upon in the future (and contingent upon third party approval), the parties had at best an "agreement to agree," which is unenforceable under California law. "[T]here is no contract where the objective manifestations of intent demonstrate that the parties chose not to bind themselves until a subsequent agreement [was] made." (*Rennick v. O.P.T.I.O.N. Care, Inc.* (9th Cir. 1996) 77 F.3d 309, 316; see also *Beck v. American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555, 1562–1563 [260 Cal.Rptr. 237] [letter manifested intent not to be bound until formal contract was written].) "Preliminary negotiations or [agreements] for future negotiations are not the functional equivalent of a valid, subsisting

agreement. 'A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.' (Rest.2d Contracts, § 26, p. 75.)" (*Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 59 [248 Cal.Rptr. 217]; but see *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251, 1255 [117 Cal.Rptr.2d 875] [recognizing cause of action for breach of agreement to negotiate in good faith];[9] and *Boyd v. Bevilacqua* (1966) 247 Cal.App.2d 272, 287 [55 Cal.Rptr. 610] [tort action permitted where joint venture agreement was sufficiently definite, as joint venture could be created with little formality and less definiteness in its details].)

*Lamle v. Mattel, Inc.* (2005) 394 F.3d 1355 also does not help Bustamante. At issue was a license for a board game. After agreeing on many of the terms at a meeting, Mattel asked Lamle to draft a formal document memorializing the deal, and it promised to sign a formal written contract by a certain date several months later. The majority of the federal appellate court panel held that a triable issue of fact existed as to whether the parties considered the meeting to have resulted in an oral contract or only a preliminary stage of negotiations regarding terms that were subject to approval and interest from distributors. In this case, however, Bustamante offered no evidence suggesting a factual dispute. Unlike *Lamle*, where the evidence of intent not to be bound was derived from only an affidavit from Mattel's vice-president, here the parties' discussions about their intended relationship were recorded in various e-mail communications. This correspondence, together with the parties' declarations, was sufficient to permit the determination of whether a contract was formed as a matter of law.

Bustamante's reliance on *Okun v. Morton* (1988) 203 Cal.App.3d 805 [250 Cal.Rptr. 220] is similarly misplaced. In that case the defendant promised the plaintiff an opportunity to participate in all future business opportunities utilizing the Hard Rock name in consideration of the plaintiff's initial investment of $100,000 in the Hard Rock Cafe Corporation (HRC). The paragraph at issue in the parties' agreement allowed them to "exploit" each opportunity "in a manner mutually agreeable in the same ratio [in] which we currently hold stock in HRC." (*Id.* at p. 812.) Considered together with properly admitted parol evidence, this provision was not fatally uncertain, the court held, because the parties had established the basic structure of their future undertakings, including financing, ownership, and operations. (*Id.* at p. 818.)

---

[9] Bustamante pleaded (and argued) that the parties had a valid contract to form Intuit Mexico, not a contract to negotiate a future business relationship.

We must conclude that the undisputed facts here show no meeting of the minds as to the essential structure and operation of the alleged joint venture, even if there was agreement on some of the terms. "[T]he failure to reach a meeting of the minds on all material points prevents the formation of a contract *even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract.*" (*Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 359 [72 Cal.Rptr.2d 598].) The evidence supplied in the moving and opposing papers establish that material terms remained uncertain well beyond the time the contract was alleged to have come into existence. Tinker's expectation was that Intuit would "do [its] homework" before entering into a business relationship with Bustamante. He described the investor funding commitment as a "critical" term, without which Intuit could not "do a deal" with Bustamante in Mexico. As late as November 2002 Bustamante and Tinker had not yet made clear the amount of money Bustamante needed to raise, and well into December they were still discussing the form and amount of compensation Bustamante would receive.[10] Even though a joint venture can be created with little formality, here the undisputed facts set forth in the moving and opposing papers provided no "basis for determining the existence of a breach and for giving an appropriate remedy." (Rest.2d Contracts, § 33, subd. (2).) None of the evidence Bustamante points to raises a triable question of *material* fact on this issue. Accordingly, Intuit was entitled to adjudication on the contract cause of action.

In light of this conclusion, it is unnecessary to reach the question of whether a triable factual issue exists as to whether the parties always contemplated that their final agreement would be in writing. We also need not decide whether the alleged agreement could not be performed within one year and therefore violated the statute of frauds (Civ. Code, § 1624). As to the second cause of action for wrongful dissociation, it is premised on the existence of a joint venture or partnership; as none was created, the trial court properly adjudicated this cause of action in Intuit's favor. Finally, the propriety of the costs award is moot, as Bustamante does not challenge this order if the grant of summary judgment is upheld.

---

[10] On November 22, 2002, Bustamante unsuccessfully tried to convince Tinker that $1 million was a sufficient amount with which to begin selling the product because the resulting momentum would attract more money. On November 25, 2002, Bustamante asked Tinker for a "clear definition from Intuit in what is the minimum amount of money that I need to raise." The following day Tinker suggested that if only $2 million could be raised, then Intuit would have to consider deferring its royalty and Bustamante to "substantially reduce/defer [his] compensation as well."

*Disposition*

The judgment is affirmed.

Rushing, P. J., and Mihara, J., concurred.