Filed 10/3/13  San Diego Natives Holding v. Hughes CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO NATIVES HOLDING COMPANY, LLC et al., | D061523 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2009-00090232-CU-OR-CTL) |
| RALPH HUGHES, Individually and as Trustee, etc., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge.  Affirmed in part, reversed in part and remanded with directions.

Law Offices of Darrell Palmer and Joseph Darrell Palmer, Janine Menhennet for Plaintiffs and Appellants.

Ralph Hughes, in pro. per., for Defendant and Respondent.

Following a bench trial on their declaratory relief cause of action (Code Civ. Proc.[1], § 1060), Eric Ireland and San Diego Natives Holding Co., LLC (collectively appellants) appeal from the portions of a judgment finding (1) they had contracted to form a partnership with respondents Ralph Hughes and the Hughes Family Trust relating to certain commercial property (at the times, the property); (2) the parties are barred from selling the commercial property for less than $100 per square foot; (3) Hughes is entitled to rent from appellants under a temporary lease and (4) each party should bear its own costs and attorney fees.

We reject Hughes's request to dismiss this appeal. Appellants do not challenge the court's orders voiding a 2007 lease agreement or ejecting Hughes from the premises; therefore, those parts of the judgment are affirmed. We also affirm the costs and attorney fee award because appellants forfeited their right to such an award by failing to timely file a motion for it. We conclude the evidence does not support the court's finding that the parties had contracted to form a partnership; therefore, we reverse that finding and other findings based on it. We remand for the trial court to make additional factual findings as directed below and enter a new judgment consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2007, Hughes and Ireland signed a handwritten, 10-year lease agreement for a 15,000 square foot commercial property in San Diego. The lease granted Hughes the right to sublease and a 10-year renewal option.

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

2

In August 2008, Ireland wrote Hughes an e-mail disavowing that lease agreement. In doing so, he reviewed the parties' original rationale for it: "If you recall, early on we had talked about points of agreement. We just never got around to producing the agreement. Then just prior to the court date, and in the absence of a formal agreement, you constructed the lease to protect your interest. I didn't have a problem with it then, but I've always felt it was a temporary substitute for a subsequent 'formal agreement.' . . . I feel a lease is too strong of an instrument and does not reflect the nature or intentions of our partnership."

Ireland next proposed an updated agreement requiring an attorney's approval and a formal contract, stating that an attorney's involvement "is important to protect both of us." Ireland specified the key elements of a future contract that he claimed was "needed, healthy and overdue:" "Point 1: I have two thirds interest, and you have a one third interest, in the property. [¶] 2. We share benefits and obligations and liabilities in the same proportion including appropriate expenses, property taxes, taxable gains or losses, etc., from the date of acquisition of the property. [¶] 3. Your expressed desire is to occupy the eastern third of the property for your casual benefit. This eastern portion offers you more personal utility, and not due to it's [*sic*] value, due to improvements, as compared to the unimproved portion of the property. In general, the one third/two third division of benefits and liabilities stands as the governing principle in our partnership. [¶] 4. We agree that the property will not be considered for sale until it has reached a value of $100 per [square foot] or more. [¶] 5. We will continue to work closely to our mutual benefit. But as you once suggested, that if we dispute an issue then your brother

3

and my brother may act as effective arbitrators to resolve the issue." Ireland ended the e-mail reiterating that his proposal was a "good start," and telling Hughes, "[W]hen you agree, we can plug [the attorney] in to produce a document within the next two weeks."

Hughes responded to Ireland by e-mail: "Thanks for the quick start on the above[.] . . . I pretty much agree with points 1, 2, 4, and 5[.]" Given Hughes's rejection of the third point, the parties never memorialized Ireland's proposal in a contract. Indeed, in March 2009, Ireland wrote Hughes opposing his unilateral decision to rent the property because he lacked partnership privileges: "I never intended to convey to you that authority[.] I need to be kept in the loop, review and consent to prospective tenants and, while I'm the sole member, enter into agreements for the LLC. Once you formally become a[n] LLC member you can act with authority. . . . I have grown increasingly uncomfortable with the lease. I never intended it to be any more than a placeholder until we made it through the court and we had a formal agreement. . . . What I need to hear is that you are willing to convert your leasehold interest into equity interest in the LLC and make the most valuable portion of the property available for necessary revenue. It is important for our business relationship."

In May 2009, appellants sued respondents for declaratory relief regarding the validity of the April 2007 lease agreement. Appellants also pleaded a cause of action for Hughes's ejection from the premises.

Hughes cross-complained, seeking declaratory relief on his claim that appellants had breached two valid lease agreements, one dated April 2007 and another dated

4

September 2007.  Hughes also pleaded a cause of action for ejection of appellants from the premises.

At trial, Ireland testified on direct examination that for 18 months, including all of 2008, he had tried to persuade Hughes to form a partnership; however, Hughes initially "didn't really care to talk about it.  He just—he would always—he was quite evasive about it.  And I figured that it was—had to do with a trust relationship and over time it would mature and change."  Ireland admitted that as late as when he initiated this lawsuit, he "was naive" in hoping Hughes "would come to the table and . . . benefit from a good deal that [Ireland]  thought was on the table."

By contrast, Hughes conceded at trial that he was using "a lot of weasel words" when he stated he "pretty much agreed" with some of Ireland's negotiating points.  Hughes claimed that because he did not agree with Ireland's third negotiating point, no partnership agreement was formed.  Hughes insisted, "I never, ever wanted to become any part of the LLC.  I wanted to have my lease."

Ireland testified on direct examination regarding his understanding of the parties' respective property interests:

"[Counsel:]  First of all, what was your intent in forming this relationship with [Hughes]?  It was that you would have two-thirds, and he would have one-third, correct?

"[Ireland:]  That is correct.

"[Counsel:]  And when you say he would—he would have a third, you were talking about ownership, right?

"[Ireland:]  Correct.

5

"[Counsel:]  Another way of describing ownership would be—

"[Ireland:]  Equity.

"[Counsel:]  Correct.  So yesterday I asked you are you excluding the concept of [Hughes] being an owner of the property, and you answered no.  And that's true, right?

"[Ireland:]  Correct."

"[Counsel:]  So from the beginning—I asked you [at trial yesterday]:  'Question: So from the beginning you were contemplating a shared ownership and ultimately a shared sharing [sic] of the gains or profits in the property.'

"[Ireland:]  Correct.

"[Counsel:]  And that's the way you answered yesterday.  Yes.  You weren't necessarily sure of the form of the ownership, were you?

"[Ireland:]  No, I was not.

"[Counsel:]  You never insisted that it be membership in an LLC, did you?

"[Ireland:]  No."

Further, referring to emails that Ireland had sent to Hughes, counsel asked Ireland, "You talk about Ireland as a two-thirds interest, Hughes as a one-third interest.  Did you ever waver from that concept?"  Ireland responded, "No, I did not."

The court issued a statement of decision.  It first discussed the property's ownership history.[2]  Next, the court relied on the parties' August 2008 e-mails, which it

---

[2]    The parties do not challenge the trial court's findings concerning the property's ownership history:  "At one point, Hughes owned the one acre property located at 2995 Commercial Street, San Diego.  When Hughes lost the property in bankruptcy, it was

noted were "written well before any litigation was contemplated and therefore have indicia of trustworthiness." It found that the April 2007 lease agreement was unenforceable because it never was intended to create a 20-year lease. The court also found no evidence that Ireland had signed a September 2007 lease agreement. It concluded the parties had mutually agreed to a temporary lease agreement in Hughes's favor for $10 per month and that based on the parties' post-lease conduct, they were operating under an unwritten partnership agreement that had superseded the temporary lease agreement. It further concluded the parties were subject to the temporary lease

purchased by A Trucking and Crane ('ATC') and the Schroeder family. . . . [¶] As a result of unrelated litigation, Hughes occupied a portion of the property pursuant to a Judgment by Stipulation, entered into on December 19, 2003[,] between Hughes, ATC, and [Schroeder]. . . . The judgment had the following relevant terms: [¶] a. Hughes was to lease two portions of the Commercial Street property, the northwest, and the northeast corners for a total rent of ten dollars . . . per month. [¶] b. The term of the lease was to be for ten years from July 21, 2003[,] to July 21, 2013. [¶] c. ATC was to provide utilities for one year; after which time Hughes was to install his own meters. [¶] d. ATC was to pay Hughes' attorney's fees in the amount of $20,000.00. [¶] e. ATC agreed not to sell the property before July 21, 2009, without Hughes' permission. [¶] f. If the property was sold between July 21, 2009[,] and July 21, 2013, Hughes was to receive 15 [percent] of the net sale proceeds. . . . [¶] ATC and Schroeder filed for bankruptcy protection after the 2003 judgment was entered. . . . Based upon the estate's obligations its creditors sought to liquidate the property. . . . [¶] When no offers were received which would have allowed Hughes to remain as a tenant, . . . in order to accomplish the sale of the property, the trustee offered Hughes a present value payout of his tenancy in the event an offer was made. . . . The amount of this proposed payout, in the event an offer of $1,600,000.00 was made, would have been $598,000.00. . . . No offers in the amount of $1,600,000.00 were ever received. [¶] . . . [¶] On May 29, 2007, with Hughes's endorsement of the deal, the trustee in the Schroeder bankruptcy obtained approval from the bankruptcy court to sell the property to Ireland for $1,200,000.00. . . . As part of the sale, Hughes released all of his remaining claims against the Schroeder family estate in an Agreement of Satisfaction, executed on April 4, 2007." (Some capitalization omitted.)

agreement until the terms of the partnership could be incorporated in a formal written agreement.

Based on these findings, the court ordered that effective August 12, 2008, "Ireland has a two-third interest as a member [of the partnership], based on his purchase of the Property for $1,200,000, and Hughes has a one-third interest as a member, based on the value of his pre-purchase leasehold interest in the Property and the benefits he relinquished under the 2003 lease/stipulated judgment to facilitate this purchase, $558,000, in SD Natives, subject to the following terms:  [¶]  i. Ireland and Hughes shall each be responsible from August 12, 2008[,] for their proportionate share of expenses incurred for the Property after an offset is applied for income received, except that Ireland shall have the responsibility to service the $750,000 Wells Fargo mortgage;  [¶] ii.  Unless mutually agreed to by Ireland and Hughes, the Property will not be eligible for or considered for sale until it has reached a fair market value of $100 per square foot; and [¶]  iii.  SD Natives and Ireland shall account to Hughes for the income received and expenses incurred for the Property from August 12, 2008."

The court ruled in favor of appellants on their ejection cause of action, ordering Hughes to vacate the property within thirty days of entry of judgment.  The court added: "Since the lease to Riley Recycling was entered into on or about May 15, 2009, during the Hughes lease at a time SD Natives was not free to enter into the leasehold agreement with Riley, on his breach of contract claim, Hughes is entitled to the rent received on the portion of the Hughes' leasehold rented to Riley during Hughes' lease."  (Some capitalization omitted.)

8

Ruling on Hughes's cross-complaint for breach of contract, the court ordered that Hughes recover $22,223 from SD Natives, constituting "the sum of $.27 per square foot for 3,500 square feet of the Property from May 15, 2009[,] through May 31, 2011 . . . ." It found Hughes had no interest in possession of any part of the property other than as a one-third owner of SD Natives. The court ruled against Hughes on his ejection cause of action.

At a November 10, 2011 hearing on the court's statement of decision, appellants' counsel asked the court to determine the prevailing party: "I think that given the very clear finding the court made regarding the 2007 lease, that at least to that issue, which was really the core of this case, my client is the prevailing party. And I don't know if it's appropriate to ask you to make a finding now." The court replied, "Not now. It's a post-trial motion." In its December 23, 2011 final judgment, the court ordered each party to pay its own costs and attorney fees.

DISCUSSION

I.

We first address Hughes's motion to dismiss this appeal. Hughes first made the motion in September 2012, on grounds that appellants had voluntarily accepted the benefit of the judgment, given that Hughes had already complied with the court's order and vacated the premises. In October 2012, we denied Hughes's motion. In June 2013, Hughes renewed the motion, relying on section 1008, subdivision (b). We deny his renewed motion because section 1008 deals with interim orders in the trial court, and does not apply on appeal. (*Betz v. Pankow* (1993) 16 Cal.App.4th 931, 937-938 ["Thus, a

9

motion for reconsideration may only be considered before final judgment is entered and while the case is still pending in the trial court.  [Citations.]  Because appellant is attempting to vacate a judgment, rather than an interim ruling, section 1008 relief is unavailable"].)  Hughes again seeks dismissal of the appeal in his opening brief, but he did not separately appeal from the judgment.  Moreover, he merely repeats his previous arguments without providing any persuasive basis for us to reconsider our prior binding order on this matter.  Therefore, we reject Hughes's request and address the issues on the merits.

II.

We rely on contract principles to determine the parties' intent in their August 2008 e-mail exchange.  (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.)  We conclude the parties intended that Ireland's negotiating points merely start a discussion regarding a future partnership, but they never agreed to it.

When, as here, the material facts are undisputed, the issue of whether a contract exists is a question of law that we independently review on appeal.  (*Bustamante v. Intuit, Inc., supra,* 141 Cal.App.4th at p. 208.)  Under Civil Code section 1550, the essential elements of a contract are:  1. Parties capable of contracting; 2. they consent; 3. a lawful object; and, 4. a sufficient cause or consideration.  " 'Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached.' "  (*Bustamante, supra*, at p. 209.)  "The material factors to be ascertained from the written contract are the seller, the buyer, the price to be paid, the

10

time and manner of payment, and the property to be transferred, describing it so it may be identified." (*King v. Stanley* (1948) 32 Cal.2d 584, 589, disapproved on another ground in *Patel v. Liebermensch* (2008) 45 Cal.4th 344, 351, fn. 4.) Civil Code section 1598 provides: "Where a contract has but a single object, and . . . [is] so vaguely expressed as to be wholly unascertainable, the entire contract is void."

"To be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 770.) Further, creation of a valid contract requires mutual assent. (*Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 59.) "Where . . . there is a manifest intention that the formal agreement is not to be complete until reduced to a formal writing to be executed, there is no binding contract until this is done." (*Smissaert v. Chiodo* (1958) 163 Cal.App.2d 827, 830-831.)

Here, it is undisputed the parties never reduced the proposed partnership agreement to a formal writing. The record shows the parties did not agree on a central issue. Specifically, Ireland's third negotiating point states in part that, "In general, the one [-] third/two[-]third division of benefits and liabilities stands as the governing principle in our partnership." Hughes never agreed to that provision, thus undermining the entire agreement. Moreover, Ireland admonished Hughes more than half a year later for making unilateral decisions, and reminded him they were still operating under the "placeholder" lease agreement. Ireland clarified, "Once you become a LLC member [*sic*] you can act with authority." The parties' testimony also supports our conclusion that they

11

never agreed to form a partnership. We also note that there is no record showing that the parties negotiated the critical matter of what consideration would support the partnership agreement. (Civ. Code, § 1550; *King v. Stanley*, *supra*, 32 Cal.2d at p. 589.)

Although the parties failed to agree on a partnership, they did agree Ireland had a two-thirds and Hughes had a one-third ownership interest in the property. At oral argument, Ireland's counsel conceded that point. For guidance to the trial court on remand, we note that based on the record at trial and counsel's concession, it appears to us the parties are tenants in common, and Ireland and Hughes enjoy a two-third and one-third ownership interest respectively in the property, its rents and expenses.

In light of our conclusion that no partnership was formed, we reverse the court's order that the parties not sell the property for less than $100 per square foot. This item was one of Ireland's negotiation points, but the parties did not formally adopt it. As Hughes testified, he had used "weasel words" when he purportedly agreed to Ireland's negotiation points.

Appellants claim the trial court inconsistently declared the 2007 lease invalid, but found that the parties had agreed to a "temporary lease" until they formalized the partnership agreement. The basis for the trial court's finding concerning a temporary lease is unclear. Therefore, on remand, the court is directed to clarify this matter.

III.

Appellants contend the trial court did not provide them an opportunity to present arguments regarding who was the prevailing party and thus entitled to costs and attorney fees. They point out the court had stated that the matter was subject to resolution in a

12

postjudgment motion. Appellants further claim, "Based upon the judgment that Hughes sued upon with the attorneys' fees provision, [they] are entitled to [their] fees." Hughes counters that the trial court properly exercised its discretion in concluding that "fairness dictated that each side should pay its own attorneys' fees."

We reject appellants' claim and dispose of this issue by relying on a case presenting a similar situation. In *Hydratec, Inc. v. Sun Valley 260 Orchard & Vineyard Co.* (1990) 223 Cal.App.3d 924 (*Hydratec*), plaintiff (Hydratec) filed three separate lawsuits against various entities, including defendant AFM. The proceedings in the three cases were consolidated, and a court trial was held. The trial court issued a written tentative decision, which was to become the statement of decision if no party requested a statement of decision. No request was made, and plaintiff's counsel thereafter furnished the court with three separate judgments, one for each of the matters tried. Each of the proposed judgments provided that the parties would bear their own costs and attorney fees. The trial court signed and filed the judgments, and AFM then filed a notice of appeal. On appeal, AFM contended that it had been the prevailing party in two of the three matters and was entitled to an award of costs and attorney fees pertaining to those matters (pursuant to a contractual attorney fee provision). (*Id.* at pp. 926–927.) The appellate court concluded, however, that "AFM's failure to file a cost bill and a claim for fees operated to waive its right to costs and fees." (*Id.* at p. 927.)

The appellate court noted that the California Rules of Court, former rules 870(a)(1) and 870.2, required a prevailing party to serve and file a memorandum of costs, as well as a notice of motion to claim attorney fees pursuant to contract, within one of the

applicable alternative time limits set out in those rules. (*Hydratec*, *supra*, 223 Cal.App.3d at p. 928.) The court observed that if a trial court entered judgment and neglected to award costs, the party entitled to claim them could request that the court correct the judgment. The appropriate procedure would be for that party to file a cost bill. (*Ibid*.) "Once a bill is presented, any subsequent failure of the court to act on it may be remedied by 'appropriate motion in the trial court or, if necessary, by a writ of mandate in the appellate courts.' " (*Ibid*., citing *Williams v. Santa Maria Joint Union High Sch. Dist.* (1967) 252 Cal.App.2d 1010, 1014, fn. 5.) The court continued: "However, the fact an incorrect cost allocation may be rectified does not mean the aggrieved party may wait and raise the issue for the first time on appeal. To the contrary, if the claimant fails to present a cost bill, a waiver of the right to costs results. The time provisions relating to the filing of a memorandum of costs, while not jurisdictional, are mandatory." (*Hydratec, supra*, at pp. 928-929.) The court found that AFM's failure to file a cost bill was fatal to its claim for costs. (*Ibid*.)

The *Hydratec* court also held that "[t]he same treatment must be given to AFM's failure to request an award of its attorney fees against Hydratec." (*Hydratec*, *supra*, 223 Cal .App.3d at p. 929.) The court reasoned that fees to which a party is entitled under Civil Code section 1717 are treated as an item of costs (see Code Civ. Proc., § 1033.5, subds. (a)(10) & (c)(5)), and as then applicable, California Rules of Court, rule 870.2 required a motion to claim attorney fees under Civil Code section 1717 be filed within the same time limits as were prescribed in California Rules of Court, rule 870 for the filing of memoranda of costs. "Since AFM did not comply with the provisions of either

14

[California Rules of Court,] rule 870 or 870.2, it waived its right to secure an award of fees pursuant to the two alternatives open to it under Code of Civil Procedure section 1033.5, subdivision (c)(5)." (*Hydratec*, *supra*, at p. 929.)

The same is true in the case before us, where no record exists showing that appellants moved for costs or attorney fees. The applicable statutes and California Rules of Court expressly state that a party requesting attorney fees based on a contract must do so in a noticed motion. Civil Code section 1717, subdivision (b)(1) provides: "The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract for purposes of this section." The California Rules of Court, rule 3.1702(e), provides that if a party is entitled to contractual attorney fees in a fixed amount, the fees must be claimed in the memorandum of costs. Otherwise, a notice of motion for attorney fees must be served and filed within the time for filing a notice of appeal. (Cal. Rules of Court, rule 3.1702(b)(1).) Trial courts have the authority to grant extensions of this deadline for "good cause"; they may do so implicitly and even after the deadline has run. (*Lewow v. Surfside III Condominium Owner Ass'n., Inc.* (2012) 203 Cal.App.4th 128, 135.) California Rules of Court, rule 3.1700 similarly limits the time for challenging a trial court's award of costs. We conclude appellants had the burden of following up on the court's indication that the matter of costs and attorney fees would be resolved in a postjudgment motion. Therefore, they forfeited the right to those items by failing to timely move for them in the trial court.

15

DISPOSITION

The portions of the judgment invalidating the April 2007 lease agreement, ordering Hughes's ejection from the subject property, and awarding attorney fees are affirmed; the portions of the judgment creating a partnership between the parties and forbidding them from selling the property until its purchase price reaches at least $100 per square foot are reversed. In light of this opinion, on remand, the court is directed to rely on the existing record to ascertain what rights, if any, each party retains in the subject property. Further, the court shall clarify whether the parties formed a temporary lease agreement. Each party is to bear its own costs on appeal.


O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.