Filed 7/27/23

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| ATON CENTER, INC., | D080122 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2019-00054459-CU-BC-NC) |
| UNITED HEALTHCARE INSURANCE COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Cynthia A. Freeland, Judge. Affirmed.

Law Office of John W. Tower and John W. Tower for Plaintiff and Appellant.

Dorsey & Whitney, Kent J. Schmidt, Michelle S. Grant and Alan J. Iverson (*pro hac vice*) for Defendants and Respondents.


INTRODUCTION

This lawsuit arises from a payment dispute between a healthcare provider and an insurance company. The provider contends it was underpaid for substance abuse treatment that it rendered to 29 patients. Seeking to

recover the difference directly from the insurance company, the provider filed suit in superior court, alleging the insurer entered into binding payment agreements during verification of benefits and authorization calls with the provider and otherwise misrepresented or concealed the amounts it would pay for treatment. The trial court entered summary judgment against the provider, from which the provider now appeals. We conclude the court did not err in determining one or more elements of the provider's causes of action could not be established. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Factual Background*[1]

United Healthcare Insurance Company, United Behavioral Health operating under the brand Optum ("UBH"), and United Healthcare Services, Inc. (collectively, "United") are insurers and third-party claims administrators for group health plans sponsored by employers that provide health benefits to their covered employees and dependents. United provides covered individuals with access to a network of providers who have contracted to accept established fees in exchange for being included in United's provider network. United does not have rate agreements with providers that are not part of its network. Before admitting or providing treatment to an individual covered by a policy issued or administered by United, out-of-network providers often contact United by phone to confirm the individual has out-of-network benefits. After verifying the individual's

---

[1]    "Following the usual standard of review from the granting of a summary judgment, we view all conflicting facts in favor of [plaintiff], the party who opposed the motion for summary judgment." (*Davis v. Nadrich* (2009) 174 Cal.App.4th 1, 3, fn. 1.)

consent, United provides the out-of-network provider with the requested information, including whether the individual has out-of-network insurance benefits, and individual member responsibility amounts, such as co-payments, co-insurance, and deductible. This is known as a verification of benefits (VOB) call.

AToN Center, Inc. (Aton) is an inpatient substance abuse treatment facility. Described by its chief executive officer, James Brady, as a "luxury" treatment center, it has offered residential substance abuse and subacute detoxification services since 2009.

At all relevant times, Aton was not part of United's provider network and had no in-network contract with United. Before admitting prospective patients covered by healthcare plans issued or underwritten by United, three Aton employees who were members of Aton's "intake team" (James Reed, Lauren Mann, and Greg Liggett) placed VOB calls to United to confirm the prospective patient's policy provided out-of-network benefits. Information obtained during the VOB calls was memorialized by Aton's intake team on a standardized " 'Insurance Quote of Benefits' " form (VOB form). The VOB form asked for, among other information, a " 'rate of reimbursement.' " The Aton intake team member filling out the form would respond to this question by selecting one of the following four options: the usual, customary, and reasonable (UCR) rate; the maximum non-network reimbursement (MNRP) rate; the Medicare (MCR) rate; or the allowed amount (AA).

During VOB calls, Aton's employees asked only whether the rate of reimbursement was "based on UCR, MCR, MNRP, or AA." They did not ask how much Aton could expect to be paid. Brady preauthorized Aton's intake team to admit prospective patients whose policies provided out-of-network coverage using the UCR reimbursement rate. For patients whose policies

3

provided out-of-network coverage at a reimbursement rate other than UCR, the admission decision was made by Brady.

This action arises out of United's alleged underpayment of claims pertaining to 29 individuals who sought and received treatment from Aton between November 2016 and May 2019. During VOB calls, United's representatives advised members of Aton's intake team that the reimbursement rate for 20 of the 29 individuals was based on the MNRP or Medicare rates, and that the MNRP reimbursement methodology relied on rates published by Medicare. Brady personally approved the admission of these 20 individuals. For the remaining nine individuals, United's representatives informed Aton's intake team during VOB calls that the rate of reimbursement was UCR. Aton contends that United should have reimbursed 50 percent of Aton's billed charges for those plans with reimbursement rates based upon the MNRP or Medicare rates, and 100 percent of Aton's billed charges for those plans whose reimbursement rate was based upon the UCR rate. Instead, United allegedly paid Aton a substantially lesser amount.

## II.

### *Procedural Background*

A. *Pleadings*

In a complaint filed in superior court in October 2019, Aton asserted causes of action for (1) breach of oral contract, (2) intentional misrepresentation, (3) negligent misrepresentation, (4) fraudulent concealment, (5) promissory estoppel, (6) quantum meruit, (7) violation of Business and Professions Code section 17200 (the Unfair Competition Law (UCL)), and (8) breach of implied contract.

4

United demurred, arguing in part that Aton's causes of action were preempted by section 514 of the Employee Retirement Income Security Act of 1974 (ERISA).[2]  United also demurred on the ground certain causes of action failed to state facts sufficient to constitute a cause of action.

In opposition, Aton argued its causes of action were not preempted by section 514 of ERISA because it was "not alleging a breach of the ERISA plan, nor [wa]s it requesting plan benefits" or seeking to advance claims "based on assignments of plan rights from its patients."  Rather, it was only asserting state law causes of action "which are not based on an insurance policy or plan, but rather on the course of dealing between [Aton] and [United] and the verbal representations and agreements that were made during . . . verification of benefit and authorization communications."

The trial court sustained United's demurrer as to Aton's cause of action for quantum meruit based on deficiencies in its supporting allegations.  The court overruled the demurrer on all other grounds, including ERISA preemption, explaining that "[a]t this stage of the case, the Court is unable to conclude that the complaint's causes of action are preempted by ERISA Section 514."

---

[2]     Section 514 of ERISA provides, in relevant part, that ERISA "supersede[s] any and all State laws insofar as they . . . relate to any employee benefit plan."  (29 U.S.C. § 1144(a); see *Pilot Life Ins. Co. v. Dedeaux* (1987) 481 U.S. 41, 48 [holding that § 514(a) preempts "common law causes of action . . . based on alleged improper processing of a claim for benefits under an employee benefit plan"]; *Fast Access Specialty Therapeutics, LLC v. UnitedHealth Group, Inc.* (S.D.Cal. 2021) 532 F.Supp.3d 956, 963–972 [concluding out-of-network pharmacy's state common law claims against insurer for inadequate payment of claims were preempted by ERISA where they were premised on preapproval letters and terms of the patient's insurance plan].)

B. *United's Motion for Summary Judgment or Alternatively, Summary Adjudication*

After conducting discovery, United moved for summary judgment or alternatively, summary adjudication of the remaining causes of action in the complaint.  It submitted the following evidence in support of its motion.

 1. *United's Moving Evidence*

  a. *Declaration of Lisa Schmidt*

Lisa Schmidt, UBH's director of customer service, oversaw call agents taking inbound VOB calls from providers.

Schmidt averred that United representatives conducting VOB calls are not authorized to enter into commitments or contracts to pay or to guarantee coverage.  The representatives merely give the provider "preliminary information" about a particular member's insurance benefits; they do not determine how claims associated with the member's treatment will be paid.  At the verification stage, UBH does not know what services will ultimately be provided, what codes will be used to bill for those services, what rates will be charged by the provider, or whether the services will be provided and billed in accordance with billing guidelines, among other conditions in the member's benefit plan.  For an out-of-network provider, the amount that will be paid on a particular claim is only determined after receiving the claim, reviewing it, and applying the plan's terms and limitations to the provider's charge.  To the extent the terms of the member's out-of-network benefit plan result in United paying an out-of-network provider less than the amount billed, the provider may bill the member for any difference between the amount reimbursed and the billed charge.

  b. *Aton's VOB Forms*

United also submitted Aton's VOB forms memorializing VOB calls relating to the terms of insurance plans covering the subject 29 patients.

6

These forms showed that in the VOB calls, United representatives had informed Aton the rate of reimbursement provided by plans covering 20 patients was based on MNRP or Medicare rates; for plans covering the remaining nine patients, United representatives had informed Aton's intake team the rate of reimbursement was "based on UCR."

       c.     *Deposition Testimony of Aton's Intake Team*

Aton employees Reed, Mann, and Liggett were responsible for placing VOB calls to insurers.

Reed, Aton's intake director, created the VOB form in addition to conducting VOB calls. The VOB process "is to call and using that [VOB] form to get the information that we need." During VOB calls, Reed and his team "try to get information about rates of reimbursement," but their primary concern "is whether or not the coverage is there and the patient is eligible for services." During the VOB process, the insurer does not "agree . . . to pay." The VOB calls were not "a promise to pay." Reed testified that he views the VOB form as information, not as a contract. Aton does not know at the VOB stage how much an insurer will pay for a particular claim.

Reed further testified that the verification of benefits process happens prior to admission. Upon admission, Aton requires patients to sign an "Insurance Agreement" form stating: " '[I]t is essential to understand that no guarantees are made in advance or at any time that insurance will cover treatment and at what rate.' " When patients complete this form, Aton does not know how much the insurer will pay. Aton could not guarantee "how [the patient's] insurance company is going to reimburse," because as Reed explained, "We can't give those numbers, because we don't have them." At the time of admission, Aton also requires patients to sign a "Financial Agreement" form that says the patient is " 'wholly responsible' " for Aton's

daily rate, including any portion not reimbursed by the insurer. Neither Reed nor Liggett could remember a single promise United made during a VOB call. Mann testified that Aton does not inform United during VOB calls that Aton expects to collect a percentage of its billed charges. She did not know what monetary amounts were associated with the reimbursement rates listed on the VOB form or whether they were the " 'same or different' " from billed charges.

d. *Deposition Testimony of Aton's CEO*

Brady testified on behalf of Aton regarding the facts supporting each of Aton's claims, including breach of contract. He had not listened to nor read transcriptions of VOB calls and was "not sure of what verbiage goes back and forth." He testified, "I get the meat and potatoes [from] the VOB forms . . . . That's all I have to look at. We don't record [United's] calls."

Brady described the oral contracts between Aton and United as follows: "Us calling and asking for the benefit. The benefit being quoted. Us under that benefit quoted having an acceptance by taking the patient into the facility. [¶] Us then performing under the conditions noted in the verification; be it . . . the prior authorization and having the proper licensure, accreditation, and then providing the services that meet or exceed the level of care . . . that were being billed to United or Optum . . . . [¶] And then the final piece of the contract is I guess reimbursement or compensation, and that's the reason we're here is we believe that wasn't fully met on [United's] side." "So again, there's been an offer, it seems, the VOB. An acceptance; the admission of the patient. Performance; which we've treated the patient. And then compensation is somewhat lacking."

Brady specifically considered "the verification of benefits quotation" to be an offer. It was his belief that "when Aton affirmatively calls United and

asks questions and United responds to those questions, . . . that's an offer[.]" Brady did not know whether United representatives conducting VOB calls have the authority to enter into contracts.

Aton did not ask during VOB calls whether reimbursement rates corresponded with billed charges. Brady testified that when Aton had asked that question in the past, "the answer has been, 'We don't know. You'll know when the claim processes.'" When Aton is quoted the UCR or MNRP reimbursement rates, Aton "believes" it knows what those rates should be.

Brady testified that UCR means the "usual and customary rate." He understands UCR to correspond to 100 percent of Aton's billed charges. He explained: "[W]hat I bill is reasonable because I bill it, I bill it to everybody the same way, and I know what my geographic area is and therefore that is UCR." He believed United understands UCR the same way based on how Aton was typically paid on UCR policies.

On the topic of the MNRP reimbursement rate, Brady testified his understanding that MNRP means 50 percent of billed charges is derived in part from a United plan document "[p]lus hundreds of payments at 50 [percent] of [the] billed charge." When asked if he knows whether United understands MNRP to be 50 percent of billed charges "in all cases," Brady stated, "I'm not United. I can't figure out what United thinks."

Brady was unaware whether United representatives "intentionally concealed anything[.]" He testified, "I'm unaware of what their intention was. I do know that we have been misquoted benefits if we're paid contrary to what our historical reimbursement was, and [the] number of plans I've looked at[.]"

### e. *Evidence Relating to the Preauthorization Process*

Dr. Kevin Murphy is tasked by Aton with demonstrating to insurers that a patient meets the criteria for "this level of care." The purpose of the authorization process is to demonstrate medical necessity. Murphy never discusses rates of reimbursement during authorization. During the authorization process, United makes no representations to Murphy regarding payment.

Between December 2016 and May 2019, United sent Aton over 50 letters authorizing "SA Detox Residential Adult" or "SA Residential Adult" services. Each authorization letter contained the following language: " 'Payment for services described in this letter is subject to the member's eligibility at the time services are provided, including employment or Healthcare Exchange premium payment status, *benefit plan limitations*, and availability of remaining coverage. An eligibility disclaimer was given at the time of this benefit request. Please discuss this with the member.' " (Italics added.) Brady acknowledged Aton had received these letters and that United had repeatedly advised Aton that payment of claims would be subject to plan limitations.

### 2. *United's Moving Arguments*

Based on the foregoing evidence, United argued that Aton could not establish one or more elements of each of the complaint's remaining causes of action.

More specifically, United argued summary adjudication of Aton's breach of oral and implied contract causes of action was appropriate because Aton could not demonstrate the existence of mutual assent or consideration. United had not agreed during VOB calls to reimburse 100 percent or 50 percent of the amounts Aton billed for treatment. United's payment

10

obligation was dependent on the terms of the operative benefit plans and was determined only after claims were submitted.

No evidence of actual, affirmative or knowing misrepresentations existed to support Aton's causes of action for intentional misrepresentation and negligent misrepresentation. Aton could not show United representatives conducting VOB calls intentionally concealed any facts, nor could it prove United had a duty to disclose the amount it would pay, defeating its fraudulent concealment cause of action. Nor could Aton establish the unfair, unlawful, or fraudulent business practices needed to support its cause of action for violation of the UCL.

C.  *Aton's Opposition to United's Motion*

1.  *Aton's Evidence Filed in Support of Its Opposition*

In opposition to United's motion, Aton submitted additional testimony from Brady, Reed, Mann, Liggett, and Schmidt, as well as testimony of three other individuals (Nikki Weidlund, an Aton employee who filled out one of the VOB forms submitted in support of United's motion; and Chi Mao and Denise Strait, both representatives of United), and an expert witness (Luisa Davis).

Aton's evidence did not include transcripts, recordings, or other like evidence establishing what United's representatives said during the VOB calls at issue. Instead, its evidence generally concerned Aton's understanding that UCR and MNRP reimbursement rates equated to 100 percent and 50 percent, respectively, of the amount Aton billed for its services. Brady was the chief source of this understanding.

In the excerpts of Brady's deposition testimony submitted by Aton, Brady testified that during VOB calls, "they [i.e., United representatives] do not give us anything other than it's an MNRP, and they may throw in that it

11

is tied to a percentage of Medicare, which we know doesn't exist. So that's nebulous." His understanding "is [that] there is not a Medicare rate[.]" Referring to language in United's MNRP plans that apparently gave a point-by-point explanation of the manner in which MNRP reimbursement rates were calculated,[3] Brady testified: "we believe that the MNRP is pointing us to they are going to reduce our billing by 50[ percent] typically, and that's what we see." Aton also submitted the same deposition excerpts relied on by United in which Brady testified to his belief that the UCR reimbursement rate corresponded to 100 percent of Aton's billed charges.

Aton also submitted a declaration from Brady in which he averred that at the time of the "claims at issue in this lawsuit," his understanding was that "United's MNRP pricing method was based on Medicare rates for the service provided." Because there was no Medicare rate for residential substance abuse treatment, Brady "understood based on payment history and [his own] understanding of the [United] plans that United was to pay 50[ percent] of billed charges."

Aton's excerpts of the Reed, Mann, and Liggett depositions largely overlapped with the excerpts submitted by United and did not change the substance of the testimony relied upon by United.

In Aton's excerpts of Schmidt's deposition testimony, Schmidt agreed United representatives gave providers accurate information about members'

---

[3]    It appears the plan language discussed by Brady gave United the option of using a so-called "GAP methodology" to calculate the MNRP reimbursement rate. Brady testified "the GAP methodology doesn't apply, so the ultimate end result is 50[ percent]." United's use of this GAP methodology when calculating reimbursement of certain claims covered by MNRP plans appears to be one source of Aton's claim that it was underpaid.

insurance benefits.  The representatives would only provide "the method, the reimbursement program," which would be either "UCR or MNRP."  To her knowledge, United's representatives did not ever inform providers "that one of the methods of payment could be 50 percent of a bill [*sic*] charge[.]"

Weidlund, the Aton employee who completed one VOB form, testified she understood when she filled out the form that MNRP meant a rate of reimbursement of 50 percent of the billed charge.  However, the source of her understanding of the meaning of MNRP was not established.

The specific duties or position of Mao, the apparent United employee, were not established.  In the deposition excerpt submitted by Aton, Mao responded to questions about United's "plan language."  Mao agreed United was required to pay claims in accordance with the terms of its plans.  Strait, another apparent United employee whose duties and role at United were not established, answered questions about United's pricing methodologies, although it was not clear she had information about the specific claims at issue in the litigation.

Davis, an expert on medical and substance use disorder claim billing and bill review, opined:  "[F]or the VOB's in which [Aton] was informed the allowed amount was to be based on the UCR, [Aton] should be paid it's [*sic*] billed amount.  In the VOB's in which [Aton] was informed that the MNRP CMS/Medicare rate pricing methodology would be used to determine allowed amounts, the allowed amount should have been 50[ percent] of the billed amount."

Finally, Aton submitted one page of a 12-page explanation of benefits it received from United. The page reflected payment for several days of treatment of one of the 29 patients whose claims were at issue.[4]

2. *Aton's Opposition Arguments*

In opposition, Aton argued its VOB and authorization processes created binding oral and/or implied contracts with United because Aton alleged that it was told it "would be paid" based on the UCR or MNRP reimbursement methods. Aton argued that United, "[b]y representing that it would pay the UCR . . . [,] provided a recognized method by which the amount it would pay would be objectively determined." Aton also emphasized that Brady "understood that [Aton] and [U]nited were entering into oral or implied agreements."

As for its promissory estoppel cause of action, Aton asserted that "[s]pecific representations/promises regarding payment rates" are "an appropriate factual predicate for promissory estoppel," but it cited no evidence of the purported promises.

Aton argued it possessed evidentiary support for its intentional misrepresentation, negligent misrepresentation, and fraudulent concealment causes of action based on the VOB forms United filed in support of summary judgment, which Aton claimed showed United "misrepresented its payment methodologies to [Aton]." Aton maintained its misrepresentation and

_____

[4]    We do not summarize evidence excluded by the trial court in response to United's objections. Aton does not challenge the court's rulings on United's evidentiary objections on appeal, and as a result, the rulings excluding the evidence from consideration are binding on appeal. (See, e.g., *RMR Equipment Rental, Inc. v. Residential Fund 1347, LLC* (2021) 65 Cal.App.5th 383, 392 (*RMR Equipment Rental*) [unchallenged trial court ruling is binding on appeal].)

14

fraudulent concealment causes of action were also adequately supported by evidence that United's MNRP payment methodology operated in a way that was "contrary to its plans." Finally, Aton argued its cause of action for violation of the UCL had evidentiary support because it "alleges two intentional fraud claims" which were supported by "allegations [that] clearly state a claim for deceptive business practices."

D.    *United's Reply*

In reply, United argued in part that Aton, having previously disavowed reliance on the terms of the patients' underlying ERISA plans when it opposed United's demurrer, was judicially estopped from relying on plan terms to oppose summary judgment.

United also argued Aton had failed to carry its burden of presenting evidence that United representatives made payment promises or commitments during VOB calls, much less promises or commitments to pay 100 percent or 50 percent of the amount Aton ultimately billed for those claims, and that Aton also failed to introduce evidence showing United fraudulently misrepresented or concealed facts during the calls.

E.    *Trial Court's Ruling*

The trial court granted United's summary judgment motion in a detailed minute order issued in November 2021.

As an initial matter, the court ruled that Aton was foreclosed from relying on the terms of United's plans to support its claims. The court explained that Aton had contended, and the court had accepted in partially overruling United's demurrer on ERISA preemption grounds, that Aton was not "(1) attempting to assert an ERISA claim; (2) alleging a breach of an ERISA plan; (3) requesting plan benefits; or (4) alleging claims based upon what the policies and/or plans may set as the payment rate." As a result,

15

Aton was judicially estopped from taking a contrary position on summary judgment.

The trial court then analyzed the parties' evidence and arguments pertaining to each of Aton's causes of action and concluded United had succeeded in showing, as to each cause of action, that Aton could not establish one or more necessary elements. The court granted United's motion in its entirety. Judgment in favor of United and against Aton was entered in December 2021. Aton was served with notice of the judgment's entry in January 2022.

## DISCUSSION

In challenging entry of summary judgment, Aton largely focuses on establishing the trial court committed legal errors. To a lesser extent, it attempts to demonstrate its evidentiary showing was sufficient to create a factual dispute precluding entry of summary judgment. As we discuss, Aton fails to establish that summary judgment was erroneously granted.

### I.

### *Standard of Review*

"Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.'" (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.) A triable issue of material fact exists only if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)

A defendant moving for summary judgment has the initial burden of presenting evidence that a cause of action lacks merit because the plaintiff

16

cannot establish an element of the cause of action or there is a complete defense.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra,* 25 Cal.4th at p. 853.)  If the defendant does so, the burden then shifts to the plaintiff to produce admissible evidence demonstrating a triable issue of material fact as to the claim or defense.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar,* at p. 850.)  Theories that are not supported by evidence will not raise a triable issue.  (Code Civ. Proc., § 437c, subd. (p)(2) ["[t]he plaintiff or cross-complainant shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists"]; *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163, 166 ["bare assertion" that the moving parties " 'fabricated' " evidence insufficient to avoid summary judgment].)

Whether the trial court erred by granting United's motion for summary judgment is a question of law we review de novo.  (See *Samara v. Matar* (2018) 5 Cal.5th 322, 338.)  " '[W]e examine the facts presented to the trial court and determine their effect as a matter of law.' " (*Regents of University of California v. Superior Court, supra,* 4 Cal.5th at p. 618.)  "We review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' [Citation.]  Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion." (*Ibid.*)

" '[A]lthough we use a de novo standard of review here, we do not transform into a trial court.' " (*Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 379 (*Dinslage*).)  We approach a summary judgment appeal, as with any appeal, with the presumption the appealed judgment is correct.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  Therefore, " ' "[o]n review of a summary judgment, the appellant has the

17

burden of showing error, even if he did not bear the burden in the trial court." ' " (*Dinslage*, at p. 379.)

## II.

### *Oral and Implied Contract Causes of Action*

A.    *Relevant Legal Principles*

The elements of a breach of oral contract cause are:  "(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." (*CDF Firefighters v. Maldonado* (2008) 158 Cal.App.4th 1226, 1239 [elements of breach of contract]; *Stockton Mortgage, Inc. v. Tope* (2014) 233 Cal.App.4th 437, 453 [elements of breach of oral contract and breach of written contract claims are the same].)  "A cause of action for breach of implied contract has the same elements as does a cause of action for breach of contract, except that the promise is not expressed in words but is implied from the promisor's conduct." (*Yari v. Producers Guild of America, Inc.* (2008) 161 Cal.App.4th 172, 182; Civ. Code, § 1621 ["An implied contract is one, the existence and terms of which are manifested by conduct."].)  " '[B]oth types of contract are identical in that they require a meeting of minds or an agreement [citation]. Thus, it is evident that both the express contract and contract implied in fact are founded upon an ascertained agreement or, in other words, are consensual in nature, the substantial difference being in the mode of proof by which they are established [citation].' " (*Pacific Bay Recovery, Inc. v. California Physicians' Services, Inc.* (2017) 12 Cal.App.5th 200, 215 (*Pacific Bay Recovery*).)

B.    *The Trial Court's Ruling*

The trial court granted summary adjudication of Aton's breach of oral contract cause of action on the ground United succeeded in showing Aton could not establish the existence of an oral contract.

The essential elements of a contract are:  "1.  Parties capable of contracting; [¶] 2.  Their consent; [¶] 3.  A lawful object; and, [¶] 4.  A sufficient cause or consideration."  (Civ. Code, § 1550.)  " '[T]he vital elements of a cause of action based on contract are mutual assent (usually accomplished through the medium of an offer and acceptance) and consideration.' "  (*Pacific Bay Recovery*, *supra*, 12 Cal.App.5th at p. 215.)  The court found the evidence of both these elements to be lacking, although its decision focused primarily on the absence of evidence of mutual consent.

"Contract formation requires mutual consent, which cannot exist unless the parties 'agree upon the same thing in the same sense.' "  (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208 (*Bustamante*), quoting Civ. Code, § 1580.)  " 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.' "  (*Bustamante,* at p. 208.)  "The question is what the parties' objective manifestations of agreement or objective expressions of intent would lead a reasonable person to believe."  (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)

In determining that Aton could not show the mutual consent required to form an oral contract, the trial court compared the asserted basis of Aton's oral contract cause of action (that the VOB calls constituted offers, and Aton's admission of patients constituted acceptances) with the evidence produced by the parties.  The court elaborated in detail on the facts and evidence that in

19

its view tended to show there was "no mutual assent or meeting of the minds between [Aton] and [United] during the VOB process as to the subject claims." These facts included the following:

United representatives conducting VOB calls only verify benefits and are not authorized to enter into commitments or contracts to pay or guarantee coverage. They did not know at the verification stage what services would ultimately be provided or the rates the provider would charge for those services. During VOB calls, insurers do not agree to pay at a specific reimbursement rate or promise to pay a certain amount, nor does Aton learn how much it will be paid for a particular claim. Liggett could not recall a single promise made by United or an occasion when he believed a contract was formed during a VOB call.

Brady admitted he did not know whether United representatives were authorized to enter into contracts, nor did he know whether Aton informed United of its belief that the VOB calls were contracts. He also did not know whether United's representatives possessed information about the correlation between UCR, MNRP, and the percentage of billed charges. While Brady believed UCR meant 100 percent of Aton's billed charges, he was unable to state based on anything other than United's payment history whether United held the same view. When asked whether he believed United understood the MNRP rate to be 50 percent of billed charges, Brady responded that he did not know what United "thinks." He also admitted that Aton does not ask during VOB calls what it will be paid; rather, when Aton is quoted UCR or MNRP reimbursement rates, it " 'believes' " it knows what those rates "should be."

The trial court concluded: "At best, [Aton] has established that *it* believed oral contracts were formed during the VOB process. However, there

is no evidence . . . [Aton] ever communicated that belief to [United], or [that United] held the same view."

Turning to Aton's implied contract cause of action, the trial court stated it shared a common factual predicate with Aton's oral contract cause of action. The court ruled that for the same reasons Aton failed to demonstrate mutual assent to enter an oral contract, it also failed to demonstrate mutual assent to enter an implied-in-fact contract. To the extent Aton's implied contract claim was based on previous payments, historical knowledge, or the parties' history, Aton failed to establish that United "agreed to pay the subject claims the same as it had paid previous claims."

C.    *Analysis of Aton's Contentions on Appeal*

1.    *Aton's Reliance on Unpublished Federal Cases Upholding Contract Claims Fails to Persuade Us the Trial Court Erred*

Aton contends the trial court erred as a matter of law by concluding its evidence fell short of establishing the mutual consent necessary to form oral or implied agreements between itself and United. Its challenge is principally derived from a line of cases in which courts have considered the viability of breach of contract claims predicated on contracts allegedly formed during VOB and/or authorization calls between a provider and insurer.

In several of the cases cited by Aton, contract claims based on such communications were rejected on the ground that " 'within the medical insurance industry, an insurer's verification is not the same as a promise to pay.' " (*TML Recovery, LLC v. Humana Inc.* (C.D. Cal. Mar. 4, 2019) No. SACV 18-00462 AG (JDEx), 2019 WL 3208807, *4 [dismissing oral and implied contract claims pursuant to Federal Rule of Civil Procedure 12(b)(6) (Rule 12(b)(6)) for failure to state a claim; "Plaintiffs allege that they verified the patients' benefits and obtained authorization as necessary. . . . But 'within the medical insurance industry, an insurer's verification is not the

21

same as a promise to pay.' "]; *TML Recovery LLC v. Cigna Corporation* (C.D. Cal. Mar. 29, 2021) No. SA CV 20-00269-DOC-(JDEx), 2021 WL 5238575, *5 [same]; *Aton Center, Inc. v. Blue Cross and Blue Shield of South Carolina* (S.D. Cal. Aug. 17, 2020) No. 3:20-cv-00496-WQH-BGS, 2020 WL 4747752, *5 [dismissing oral contract claim based on VOB calls pursuant to Rule 12(b)(6) for failure to state a claim].)  As one of these courts explained, "VOB and authorization phone calls alone are generally insufficient to form the basis for an oral or implied contract because they lack a manifestation of intent to enter into a contract."  (*Aton Center, Inc. v. Blue Cross and Blue Shield of South Carolina, supra*, 2020 WL 4747752 at p. *3.)

In *Pacific Bay Recovery, supra*, 12 Cal.App.5th 200, this court reached a similar conclusion and affirmed a trial court's ruling sustaining a demurrer to a breach of implied contract cause of action.  There, the provider alleged it contacted the insurer to obtain prior authorization, was advised the prospective patient was insured for the treatment to be rendered and that the provider "would be paid" for the treatment, and " 'was led to believe that it would be paid a portion or percentage of its total billed charges, which charges correlated with usual, reasonable and customary charges.' "  (*Id.* at p. 216.)  We held these allegations "lack[ed] the specific facts required for us to determine there was any meeting of the minds between the parties," including because "it does not appear the parties reached any sort of agreement as to the rate [the insurer] would pay [the provider]."  (*Ibid.*)  We further held the provider failed to state a cause of action for estoppel because it "has not alleged a promise clear and unambiguous in its terms."  (*Id.* at p. 215, fn. 6.)

Aton does not dispute the consensus reached by the above district courts, namely, that " 'within the medical insurance industry, an insurer's

22

verification is not the same as a promise to pay.' " (*TML Recovery, LLC v. Humana Inc., supra,* 2019 WL 3208807, at p. *4.) It argues the cases rejecting contract claims premised on verification and/or authorization calls are distinguishable because in each of them, "the insurers were only asked and the providers were only informed that the subject patient was 'insured, covered, and eligible for coverage' under [the insurers'] plan for the services [the provider] provided." It contends the viability of its contract claims should instead be decided in accordance with the following cases where courts have upheld such claims.

In *Summit Estate, Inc. v. Cigna Healthcare of California, Inc.* (N.D. Cal. Oct. 10, 2017) No. 17-CV-03871-LHK, 2017 WL 4517111, the district court denied the defendant insurers' motion pursuant to Rule 12(b)(6) to dismiss the plaintiff provider's breach of oral contract claim. The court explained: "Plaintiff's complaint does not allege that Defendants merely verified coverage to Plaintiff. Instead, Plaintiff's complaint alleges that, 'in all cases,' Defendants *told* Plaintiff that 'Defendants *would pay* for treatment at the usual, reasonable and customary rate.' [Citation.] Thus, Plaintiff has alleged sufficient facts to plausibly suggest that Defendants exhibited outward conduct indicating Defendants' intent to contract with Plaintiff." (*Summit Estate, Inc.,* at p. *3, italics added.)

In *Aton Center, Inc. v. Blue Cross and Blue Shield of Illinois* (S.D. Cal. Feb. 16, 2021) No. 3:20-cv-00500-WQH-BGS, 2021 WL 615051, the court denied a Rule 12(b)(6) motion to dismiss an oral contract claim where the provider alleged it " 'was advised in . . . VOB calls . . . [the insurer] *would pay* for inpatient treatment, based on the usual, customary and reasonable rate (UCR) and/or prior payment history' "; that for certain patients, the insurer told the provider it " '*would pay* 60[ percent] of [the provider's] billed

23

charges' " and for others it " 'would pay 80[ percent] of [the provider's] billed charges.' " (*Id.* at p. *5, italics added.) The complaint also affirmatively alleged the provider and insurer " 'entered into agreements' " whereby the provider would provide treatment to the insured patients. (*Ibid.*) The court explained "[t]he factual allegations of oral contract go beyond VOB and authorization calls describing the type of treatment and specific billing rates" and there were "sufficient facts to infer mutual consent in which 'the parties all agree[d] upon the same thing in the same sense.' " (*Ibid.*)

And in *Aton Center, Inc. v. Carefirst of Maryland, Inc.* (D. Md. Dec. 14, 2021) No. DKC 20-3170, 2021 WL 5909101, the district court granted the provider leave to amend its complaint to assert a breach of express contract claim where the proposed pleading alleged the defendant insurers stated during VOB calls they " '*would pay* for inpatient treatment' " at specified percentages of the provider's billed charges. (*Id.* at p. *3, italics added.) The court concluded the complaint alleged "sufficiently definite promises" including because it "specif[ied] the precise percent of the billed amount that [the insurer] allegedly promised to pay during the VOB calls[.]" (*Ibid.*)

Aton contends its oral and implied contract claims are like the contract claims in these three cases because "[t]he evidence before the trial court here went well beyond simply verifying coverage" and showed "United informed [Aton] *it would pay* for either of its treatments (detox care or residential treatment) under the UCR or MNRP pay rates." (Italics added.) Aton argues, "where (as here) facts go beyond mere verification of coverage and into promises to pay for treatment . . . at a specific rate," courts allow contract claims to proceed. United responds that the cases Aton relies upon are distinguishable because they were decided in procedural contexts other than summary judgment.

24

In our view, the problem with Aton's reliance on these cases is factual rather than procedural.[5] Although the cases involved pleadings challenges rather than summary judgment, they nevertheless addressed the sufficiency of contract claims based on verification calls, and each determined that particular factual allegations supported an inference of mutual assent. They are therefore at least potentially persuasive authority for the proposition that the same conclusion should be reached in another case involving similar facts.

Instead, our difficulty with Aton's challenge to the trial court's ruling is that it is built on two unfounded factual assertions: that its evidence showed United's representatives conducting VOB calls used words constituting an offer or promise (e.g., that United "would pay" Aton); and that United and Aton mutually understood the "UCR or MNRP pay rates" corresponded with 100 percent and 50 percent, respectively, of Aton's billed charges. As we shall discuss, Aton produced no evidence tending to show United's representatives made promises or offers during VOB calls. It also failed to introduce evidence that both sides possessed the same understanding of the UCR and MNRP reimbursement rates. For these reasons, Aton's authorities are inapposite.

As Aton implicitly concedes by repeatedly asserting that the evidence before the trial court showed United representatives told Aton that United "would pay" Aton for certain types of treatment at specific rates, the use of such words during VOB calls is material to Aton's claim that an oral contract was formed during the calls. In the case of an express agreement, mutual

---

[5] Unpublished federal court cases like those on which Aton relies are citable only for their persuasive value. (*Gray v. Quicken Loans, Inc.* (2021) 61 Cal.App.5th 524, 528, fn. 2.)

assent is manifested in words, usually "through the medium of an offer . . . communicated to the offeree and an acceptance . . . communicated to the offeror." (1 Witkin, Summary of Cal. Law (11th ed. 2017) Contracts, § 117, pp. 158–159 [citations omitted].) " ' "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." ' " (*City of Moorpark v. Moorpark Unified Sch. Dist.* (1991) 54 Cal.3d 921, 930.) Determining whether a particular communication reasonably constitutes an express offer requires an examination of the words used by the purported offeror as well as the circumstances surrounding the offer. (See e.g., *ibid.*; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, §§ 130–132, pp. 170–173.)

As Aton acknowledges and as courts like those in the cases referenced above have held, when an insurer merely provides information about a prospective patient's healthcare plan in response to a provider's inquiries, this does not, on its own, amount to a promise to pay. (See, e.g., *TML Recovery, LLC v. Humana Inc.*, *supra*, 2019 WL 3208807, at p. *4 [" 'within the medical insurance industry, an insurer's verification is not the same as a promise to pay' "].) But when (as in the cases relied on by Aton) the insurer goes further and tells the provider it *will pay* the provider for a particular patient's treatment, the insurer may be found to have extended an offer or promise because such words reasonably signal an intent to transact. (See e.g., *Aton Center, Inc. v. Blue Cross and Blue Shield of Illinois*, *supra,* 2021 WL 615051, p. *5 [intent to contract could be inferred from allegations insurer advised provider during VOB calls it "*would pay* for inpatient treatment," " '*would pay* 60[ percent] of [the provider's] billed charges' " and " '*would pay* 80[ percent] of [the provider's] billed charges' " (italics added)];

26

and see generally *Richards v. Flower* (1961) 193 Cal.App.2d 233, 235–236 (*Richards*) [rejecting argument that a defendant made a binding offer to sell property "merely because he chose to answer certain inquiries" by the plaintiffs]; *Leo F. Piazza Paving Co. v. Bebek & Brkich* (1956) 141 Cal.App.2d 226, 228–232 [subcontractors prepared detailed price quotations in response to general contractor's request, on which the general contractor relied; held, not a firm offer].)  We do not suggest that a contract is created whenever an insurer's representative uses the words "will pay" during a VOB call.  Instead, we merely hold that to the extent Aton relies on decisions allowing contract claims to proceed on the basis of such facts, it fails to establish those facts exist in this case.

The difficulty with Aton's challenge is that contrary to its contentions, no evidence was introduced showing United representatives conducting VOB calls used words objectively manifesting contractual offers or promises of payment.  United's moving evidence established that its representatives who conducted VOB calls were not authorized to enter into commitments or contracts or guarantee payment, which supported a reasonable inference that no express promises or offers to pay were made during the VOB calls at issue.  United further established through Reed's testimony that during the VOB process, insurers do not agree to pay at a specific reimbursement rate.  Reed also testified he regarded VOB forms as information rather than as contracts.  In the excerpts of Brady's deposition testimony submitted by United, Brady described the VOB calls as "[Aton] calling and asking for the benefit.  The benefit being quoted."  Brady's description established only that United provided plan information in response to Aton's inquiries, the very sort of communications that have been held to fall short of forming the basis of an oral contract.  United's moving evidence thus supported the conclusion the

27

VOB calls were devoid of communications objectively manifesting an intent to contract.

In opposition, Aton introduced no evidence at all of the actual words used by United representatives during VOB calls, much less evidence tending to show United's representatives conducting VOB calls used words reasonably constituting an offer or promise to pay. Instead, it relied on the complaint's allegations "that [Aton] was told it would be paid[.]" A party cannot avoid summary judgment by relying on "the allegations or denials of its pleadings." (Code Civ. Proc., § 437c, subd. (p)(2).) Although Aton pointed to testimony that Brady "understood" Aton and United were entering into oral or implied agreements during the VOB calls, the evidence established Brady did not participate in or listen to the calls. His unilateral, subjective impression of their effect falls short of establishing mutual assent. (See *Bustamante*, *supra*, 141 Cal.App.4th at p. 208 [" 'If there is no evidence establishing a manifestation of assent to the "same thing" by both parties, then there is no mutual consent to contract and no contract formation.' [Citation.] 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.' "].)

On appeal, Aton again cites no evidence establishing that United representatives said anything during VOB calls that, when reasonably interpreted, conveyed an intent to enter into a contract. Instead, Aton asserts, "United informed [Aton] *it would pay* for either of its treatments (detox care or residential treatment) under the UCR or MNRP pay rates." (Italics added.) Aton cites two pages of VOB forms (one completed by Reed, the other by Liggett) in support of this assertion. However, these forms only

reflect that Reed and Liggett learned from a United representative that a prospective patient's policy used the UCR or MNRP reimbursement rate. They do not indicate what the United representative's actual words were or otherwise reflect that the representative said United "would pay" for the prospective patient's treatment. Moreover, Reed, the creator of the VOB forms, testified Aton's VOB forms are merely informational. Aton's citation to the forms therefore fails to establish that its communications with United went "beyond VOB . . . calls describing the type of treatment and specific billing rates."[6] (*Aton Center, Inc. v. Blue Cross and Blue Shield of Illinois*, *supra*, 2021 WL 615051, at p. *5.)

Turning to Aton's second argument—that both sides did or should have understood that MNRP meant "50[ percent] of the provider's billed charges" and UCR meant "100[ percent] of [Aton's] billed charges"—this contention also does not withstand scrutiny. Although Aton cites evidence ostensibly supporting its assertion, an examination of the evidence reveals it does not provide factual support for Aton's claim.

---

[6]      In reply, Aton, citing excerpts of Mann's deposition testimony submitted in opposition to summary judgment, argues for the first time on appeal that Mann "believed the VOB calls represented promises to pay." This argument, and the testimony on which it relies, do not compel reversal of summary judgment. Mann testified about two specific VOB forms and calls, not VOB calls in general. Mann's subjective belief the calls "represented" a promise does not establish the same conclusion would be reached under an objective standard. (*Bustamante*, *supra*, 141 Cal.App.4th at p. 208.) Mann was interpreting the VOB forms and did not indicate she had an independent recollection of the calls. And at the summary judgment hearing, Aton's counsel told the trial court none of the intake employees, including Mann, "remember these calls."

Aton relies in part on Brady's declaration that United "historically paid" 50 percent of Aton's billed charges "under the MNRP method." However, this only establishes Brady's unilateral expectation that United's future reimbursements would reflect its historical payment rates; it does not establish that the parties mutually agreed during VOB calls that United's payment of the subject claims would comport with its payment of prior claims. Aton also relies on Brady's deposition testimony that UCR means "[u]sual, customary, reasonable" and Aton "meet[s] all those criteria."[7] Again, however, this evidence shows only that Brady believed Aton's rates were usual, customary, and reasonable, not that United held the same belief.

Aton also attempts to rely on "the language United uses in its own plan." We decline to consider this evidence. Aton has not challenged the trial court's ruling that Aton is judicially estopped from asserting claims "based upon what the policies and/or plans may set as the payment rate." As a result, the ruling is binding on appeal (*RMR Equipment Rental, supra* 65 Cal.App.5th at p. 392) and Aton may not rely on the terms of United's plan to resurrect its claims.

Aton also relies on the averment of its expert that for " 'the VOB[s] in which [Aton] was informed that the allowed amount was to be based on the UCR, [Aton] *should be paid its billed amount*.' " However, this statement merely reflects the expert's opinion of the operation of the UCR reimbursement methodology in hindsight. It does not establish that United

_____

[7] Although Aton also cites three other parts of the record (one pertaining to Brady's declaration and two pertaining to Brady's deposition testimony), the citations are either not comprehensible or fail to address the UCR.

30

held the same view or that it agreed during VOB calls to fully reimburse Aton whatever it ultimately billed for a particular treatment.

Finally, although Aton refers to United's authorization of treatment in the heading of the relevant section of its opening brief on appeal, it does not go on to present a developed argument explaining how the authorizations evidenced agreements to pay Aton at specified rates. Any such argument has been forfeited. (*Oak Valley Hospital Dist. v. State Dept. of Health Care Services* (2020) 53 Cal.App.5th 212, 228 [undeveloped arguments are forfeited on appeal].) Even if we were to consider the authorizations, we would not regard them as evidence of payment agreements independent of the terms of United's plans. United's evidence pertaining to authorizations established that payment was not addressed during the authorization process. Dr. Murphy testified that rates of reimbursement or payment are not discussed by him or United during authorization. United's authorization letters were devoid of information about the cost of anticipated treatment. To the contrary, they cautioned that "[p]ayment for services described in this letter is subject to," among other things, "benefit plan limitations." This evidence tends to negate, rather than establish, that any rate agreement was formed during the authorization process, much less an agreement that was independent of existing plan terms. (See *Pacific Bay Recovery*, *supra*, 12 Cal.App.5th at p. 216 [no implied contract formed during prior authorization process where "it does not appear the parties reached any sort of agreement as to the rate [the insurer] would pay [the provider]"].)

In short, Aton fails to cite record evidence supporting either of its factual assertions. As a result, it fails to establish that the trial court erred by concluding it lacked evidence to prove the mutual assent necessary to establish the existence of an oral or implied contract with United.

31

Aton's appellate reliance on *Bristol SL Holdings, Inc. v. Cigna Health and Life Ins. Co.* (9th Cir. Jan. 14, 2022) 2022 WL 137547 (mem. dispo.) (*Bristol SL Holdings*) does not persuade us to reach a different conclusion about the viability of its contract claims. There, the district court granted summary judgment in favor of Cigna after concluding there was "a lack of discussion between the two parties over the 'usual, customary, and reasonable rate' (UCR)" and because it determined that automatic disclaimers played before verification and authorization calls prevented formation of any contract. (*Id.* at p. *1.) The Ninth Circuit reversed in a memorandum disposition, holding the first of these determinations was simply incorrect—the provider did, in fact, "introduce evidence of discussions over UCR, which the district court improperly ignored." (*Ibid.*) As for the disclaimers, the appellate court held they did not eliminate the possibility contracts were formed during the calls. (*Ibid.*)

Unlike *Bristol SL Holdings*, here we have been presented with no evidence of "discussions over UCR" that the trial court improperly ignored. Although the trial court did note the existence of disclaimers in United's authorization letters, it cited this as one of numerous factors supporting its finding that Aton failed to establish mutual assent, unlike *Bristol SL Holdings* in which the district court viewed such disclaimers as independently precluding contract formation. Moreover, *Bristol SL Holdings* did not address ERISA preemption, and the disclaimer language it considered (that any information provided " 'does not guarantee coverage or payment' ") was unlike the disclaimer language discussed above. (See *Bristol SL Holdings, supra,* 2022 WL 137547 at p. *1.) The court therefore had no occasion to consider the extent to which disclaimers like those at issue in this case tend to dispel the implication the insurer's authorizations created

32

payment agreements independent of plan terms.  In short, the reasoning of
*Bristol SL Holdings* does not persuade us that the trial court in this case
erred.

> 2.  *Aton's Additional Arguments Lack Merit*

Aton separately advances seven additional arguments challenging the
trial court's summary adjudication of its oral and implied contract causes of
action.  We address each and conclude none justify reversal of summary
judgment.

Aton's first argument is addressed to the trial court's finding that
United representatives responsible for conducting VOB calls were not
authorized to enter into contracts to pay or guarantee coverage on United's
behalf.  Aton asserts the authority of United's representatives "could not be
adjudicated at the summary judgment stage because their agency in that
regard presented a question of fact."  It is well settled, however, that issues of
fact appropriately serve as the basis for entry of summary judgment when
they are *not* in dispute.  (See Code Civ. Proc., § 437c, subd. (p)(2).)  There is
nothing unique about an employee's scope of agency that might exempt it
from this rule.  (See, e.g., *Universal Bank v. Lawyers Title Ins. Corp.* (1997)
62 Cal.App.4th 1062, 1066 [summary judgment is appropriate where the
evidence of agency is undisputed and susceptible of only one inference].)  No
material dispute was presented as to United VOB representatives' lack of
authority to contract on behalf of United, and the trial court did not err by
relying on this undisputed fact in reaching its decision.

Aton contends "a jury could find [United representatives'] actual or
ostensible authority was implied" based on evidence United's representatives
provided "payment rates" to Aton.  We are not persuaded.  "Ostensible
authority is such as a principal, intentionally or by want of ordinary care,

33

causes or allows a third person to believe the agent to possess." (Civ. Code, § 2317.) "A corollary derived from this principle is that ostensible authority of an agent cannot be based solely upon the agent's conduct." (*Pierson v. Helmerich & Payne Internat. Drilling Co.* (2016) 4 Cal.App.5th 608, 635.) Aton's ostensible agency theory relies on the conduct of United's representatives. Because it cites no evidence of acts by United that caused it to believe United's VOB representatives possessed authority to contract, Aton's argument fails.

Second, Aton maintains the parties did not have to inform each other of their intent to enter into a contract for a contract to be formed. This point is true enough. (See, e.g., Rest. 2d Contracts, § 21, com. *a.* [explaining that the parties' "accurate understanding of the applicable law" and "intention to affect legal relations . . . may be important in interpreting their manifestations of intention . . . but they are not essential to the formation of a contract"].) However, Aton fails to explain how it establishes reversible error. It leaps from this point to the following conclusion: "Therefore, the evidence in this case satisfies all of the necessary elements of the existence of a contract." We are not required to address such an undeveloped argument and instead pass on it without further consideration. (See *Dinslage, supra,* 5 Cal.App.5th at p. 379 [" ' "On review of a summary judgment, . . . 'it is the appellant's responsibility to affirmatively demonstrate error' " ' " which requires it to both " 'direct the court to evidence that supports [its] arguments' " and " 'explain how [its cited authority] applies in [its] case' "].)

Aton's third argument consists of a series of disconnected assertions that again fail to establish reversible error. It argues (1) "it does not matter that both sides may have differing views on the meaning of the VOB calls" because mutual consent is determined under an objective standard;

34

(2) mutual consent is ultimately an issue of fact; (3) to the extent Brady's understanding of VOB calls differed from that of Aton's intake team, Brady's understanding "is the one that matters," and any internal misunderstanding raises a factual issue precluding summary judgment. The first and second points are true, but do not establish reversible error given our conclusion the summary judgment record was devoid of evidence of communications during the VOB calls that objectively manifested mutual assent. The third point lacks merit because Brady's unilateral, undisclosed, subjective interpretation of the VOB calls (which, we note, was not informed by actual knowledge of what was said during the calls) is not evidence of mutual assent. (See *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 ["The parties' undisclosed intent or understanding is irrelevant to contract interpretation."].)

And to the extent Aton claims its own *internal* misunderstanding about the VOB calls "raises . . . a factual dispute, precluding summary judgment," it confuses the issue. The mutual assent required for United and Aton to form a contract is assent between United and Aton, not between Aton's employees and its CEO. (See Civ. Code, § 1565 [consent of the parties to a contract must be "[f]ree," "[m]utual," and "[c]ommunicated by each to the other"]; Rest. 2d Contracts, § 18 ["Manifestation of mutual assent to an exchange requires that *each party* either make a promise or begin or render a performance" (italics added)].)

Aton's fourth argument relies on *California Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 482 and Civil Code section 1610. In *California Lettuce Growers*, our high court applied the rule that "[t]he absence of price provisions does not render *an otherwise valid contract* void" in holding that an agreement to grow sugar beets was not void for want of a

35

price provision. (See *California Lettuce Growers*, *supra*, 45 Cal.2d at pp. 481, 482, italics added.) And Civil Code section 1610 states: "When a consideration is executory, it is not indispensable that *the contract* should specify its amount or the means of ascertaining it. It may be left to the decision of a third person, or regulated by any specified standard." (Italics added.) Both authorities presuppose the existence of a valid contract onto which the element of consideration can be superimposed. Here, the essential problem is that Aton failed to introduce evidence of the mutual assent required to form contracts with United. Without mutual assent, there are no extant contracts, and no basis for employing the foregoing authorities to fill in the assertedly missing payment term.

Fifth, Aton contends the trial court's reliance on the "boilerplate disclaimer" contained within "*some* authorization letters United issued *after* the VOB calls" is misplaced because a meeting of the minds could objectively be found "from the verification calls alone." However, Aton identifies no record evidence supporting its assertions. As we have already discussed, Aton failed to introduce evidence of statements during verification calls from which an objective manifestation of intent to enter a binding agreement might be gleaned. We again pass on Aton's unexplained, unsupported assertion to the contrary. (*Dinslage*, *supra*, 5 Cal.App.5th at p. 379 ["An appellant who fails to pinpoint the evidence in the record indicating the existence of triable issues of fact will be deemed to have waived any claim the trial court erred in granting summary judgment."].)

Aton's sixth challenge to the trial court's ruling is directed at the contract element of consideration. As a separate ground for granting summary adjudication, the trial court ruled that Aton's oral contract cause of action failed because "[d]uring the VOB process . . . [Aton] did not need to

36

treat [United's] members and [United] was under no obligation to pay [Aton] for services"; as a result, there was no "bargained-for-exchange" between the parties. We need not and do not address Aton's challenge to this ruling, which served as an independent basis for the court's decision to grant summary adjudication. Mutual consent and consideration are separate elements of contract formation (see Civ. Code, § 1550), and summary adjudication is properly granted where the moving party succeeds in establishing that a single element of a cause of action cannot be proven (Code Civ. Proc., § 437c, subd. (p)(2)). Because Aton has failed to establish error in the court's mutual consent ruling, we would not reverse the grant of summary adjudication even if we were to agree with Aton's appellate challenge to the court's ruling on consideration.

Aton's seventh argument is that the trial court erred in its resolution of Aton's breach of implied contract cause of action. According to Aton, the court erroneously relied only on "the verbal promises alleged" and failed to consider that "there was also a course of conduct, including treatment, authorization calls, and a prior payment history at rates consistent with [Aton's] expectations."

We disagree that the court failed to comprehend the full scope of Aton's implied contract claim. The court expressly considered that Aton's implied contract claim, in addition to relying on VOB calls, also relied on "previous payments, historical knowledge, [and] the parties' history." The court concluded its reliance on these matters was unavailing as Aton "provides no evidence that [United] agreed to pay the subject claims the same as it had paid previous claims." Aton, responding to the latter point about the paucity of its evidence, points to evidence that the claims of one of the 29 subject patients were paid at disparate rates. We disagree that this is evidence of an

37

implied agreement to pay at any particular rate.[8]  (See *Pacific Bay Recovery*, *supra*, 12 Cal.App.5th at p. 216 [no implied contract where plaintiff alleged the insurer "did pay a portion of the billed charges, but [the provider] argue[d] it was not enough"].)

In sum, Aton fails to establish that the trial court erred by granting summary adjudication of its oral and implied contract causes of action.

III.

*Promissory Estoppel Cause of Action*

"The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.' " (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 901.)

The trial court granted summary adjudication of Aton's promissory estoppel cause of action on the ground that "[Aton's] evidence fails to demonstrate that [United] made **any** promises to [Aton] during the VOB process, much less promises to reimburse as a percentage of billed charges.

---

[8]  Similarly, to the extent Aton argues Brady's testimony showed United had a history of "*consistently*" paying Aton's bills at 100 percent of the billed amount "under the UCR" and 50 percent of the billed amount "on MNRP quotations," we disagree with this description of his testimony.  In the cited testimony, Brady discussed his understanding of MNRP and UCR, and he stated Aton had received "numerous" prior payments of 50 percent of its billed charges when the MNRP rate was quoted, but he did not specify how frequently this had occurred.  (Cf. *Pacific Bay Recovery*, *supra*, 12 Cal.App.5th at p. 216 [no implied contract where insurer only paid for six of 31 total days of treatment]; *IV Sols., Inc. v. United Healthcare Servs.* (C.D. Cal. Sept. 27, 2017) 2017 WL 6372488, *14 [no implied contract based on allegations of past payment where the referenced payments amounted to no more than 51 percent of overall claims].)

At best, [United] provided [Aton] with coverage information for its insureds/[Aton's] potential patients, which does not amount to a clear and unambiguous promise to pay a certain dollar amount or a percentage of billed charges."

Aton challenges this conclusion, arguing, "United did more than merely provide coverage information in vague terms. It *gave* reimbursement methods often supported by specific percentages, and then *authorized* specific treatment for patients for a specific duration. That is enough for a trier of fact to find a clear promise." (Italics added.)

We disagree. " ' "[A] promise is an indispensable element of the doctrine of promissory estoppel. The cases are uniform in holding that this doctrine cannot be invoked and must be held inapplicable in the absence of a showing that a promise had been made upon which the complaining party relied to his prejudice . . . ." [Citation.] The promise must, in addition, be "clear and unambiguous in its terms." [Citation.] "Estoppel cannot be established from . . . preliminary discussions and negotiations." ' " (*Granadino v. Wells Fargo Bank, N.A.* (2015) 236 Cal.App.4th 411, 417 (*Granadino*); see *Pacific Bay Recovery*, *supra*, 12 Cal.App.5th at p. 215, fn. 6 [provider failed to state a cause of action for estoppel because it did not allege "a promise clear and unambiguous in its terms"].)

Aton is confusing the requirement of specificity with the requirement of the existence of a promise. "A 'promise' is an assurance that a person will or will not do something." (*Granadino*, *supra*, 236 Cal.App.4th at p. 417.) As we have already discussed, United's moving evidence tended to establish that no commitments were made by United representatives during VOB calls. To the contrary, United's evidence established that VOB calls were not "promises to pay." In opposition, Aton identified no evidence supporting a

39

reasonable inference that clear and unambiguous promises or assurances of payment at rates corresponding to Aton's billed charges were actually made during the VOB calls at issue or the authorization process. Aton's appellate assertions, which are unsupported by citations to record evidence, that United "gave" reimbursement methods and then authorized treatment fall short of establishing that United promised to pay Aton in accordance with Aton's expectations.[9]

The unpublished federal court cases on which Aton relies do not demonstrate otherwise. For reasons we have already explained, *Bristol SL Holdings, supra*, 2022 WL 137547, is inapposite. The other cases cited by Aton are distinguishable because they were decided at the pleadings stage and involved alleged facts distinct from the facts that were proven here. (See, e.g., *Aton Center, Inc. v. Blue Cross and Blue Shield of Illinois, supra*, 2021 WL 615051, at p. *6 [where complaint alleged sufficient facts to state a claim for breach of oral contract, it also alleged facts "to infer a clear and unambiguous promise"]; *California Spine and Neurosurgery Institute v. Oxford Health Ins. Inc.* (N.D. Cal. Nov. 20, 2019) No. 19-cv-03533-DMR, 2019 WL 6171040, *2–5 [denying motion to dismiss and permitting promissory

---

9    We disagree with Aton's contention that the reimbursement methods provided during VOB calls were "often supported by specific percentages," to the extent Aton implies the specific percentages pertained to its own charges. The VOB forms, in addition to asking for a rate of reimbursement, asked for the percentage "[r]eimbursed after the deductible is met[.]" Reed, the creator of the VOB forms, testified this percentage corresponded to the rate of reimbursement reflected in the form. He agreed, by way of example, that for a VOB form indicating a rate of reimbursement of MNRP and a "percent reimbursed" of 90 percent, this meant "the amount of reimbursement . . . is 90 percent of the MNRP[.]" The forms did not "say anything about percentage of total charges."

estoppel claim to proceed where "the parties have not yet had the opportunity to develop evidence of industry custom about whether Defendants' authorization of services coupled with a verification call constitutes a promise to pay"].)

## IV.

### *Intentional Misrepresentation, Negligent Misrepresentation, and Fraudulent Concealment*

In a single section of its opening brief on appeal, Aton collectively challenges the trial court's summary adjudication of its second, third, and fourth causes of action for intentional misrepresentation, negligent misrepresentation, and fraudulent concealment. The trial court granted summary adjudication of these causes of action after determining evidence supporting several elements of each cause of action was lacking.

The elements of intentional misrepresentation "are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage." (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 230–231.) The trial court granted summary adjudication of Aton's intentional misrepresentation upon concluding that United succeeded in showing that Aton could not prove United made misrepresentations, knew any alleged misrepresentations were false, or intended to induce Aton's reliance on the purported misrepresentations.

The elements of negligent misrepresentation are: "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." (*Apollo Capital Fund LLC v. Roth Capital*

41

*Partners, LLC* (2007) 158 Cal.App.4th 226, 243.) The trial court found that United succeeded in showing Aton could not establish a misrepresentation of a past or existing material fact (since misrepresentations about future payment rates concerned future conduct), or United's intent to induce Aton's reliance on the purported misrepresentation.

The elements of fraudulent concealment are "(1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact." (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 606.) The trial court concluded that Aton could not establish the elements of United's concealment or suppression of a material fact; United's duty to disclose the purported material fact; and United's intent to defraud Aton.

Aton asserts five collective challenges to these rulings. First, it asserts that its "fraud claims . . . raise factual issues." (Boldface and italics omitted.) In part, Aton points to two unpublished federal district court orders. (*Summit Estate, Inc. v. Cigna Health and Life Insurance Co.* (N.D. Cal. Mar. 30, 2022) No. 5:20-cv-04697-EJD, 2022 WL 958380, *3–4; *Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc.* (D.N.J. Mar. 6, 2012) No. 11–2775 (JBS/JS), 2012 WL 762498, *12.) However, these decisions are inapposite because they addressed the sufficiency with which the provider's complaint alleged fraud or negligent misrepresentation. Aton's only attempt to identify a factual dispute precluding summary adjudication of its "fraud claims" is this assertion: "Given that United paid substantially less than

42

what was promised and less than how it had even historically reimbursed [Aton] provides the sort of circumstantial evidence needed to support the fraud claims."  This argument runs afoul of the rule that " 'something more than nonperformance is required to prove the defendant's intent not to perform his promise.' " (*Tenzer v. Superscope* (1985) 39 Cal.3d 18, 30.)  "[I]f plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury." (*Id.* at p. 31.)  Accordingly, we reject Aton's first argument.

Aton's second and third arguments are perfunctory and undeveloped. Its second argument is:  "that United's VOB team may have only innocently passed on information United provided it does not get United off the hook for fraud" because " 'a principal may be liable where he intentionally misinforms or withholds information from the agent and the agent thereon innocently misrepresents.' "  However, Aton cites no record evidence establishing that United intentionally misinformed or withheld information from its agents. Its third argument is:  "fraud usually presents a question of fact" and "[c]ertainly, whether United intended to defraud or induce reliance raises factual issues."  This argument is also unaccompanied by citation to evidence purportedly showing United's intent to defraud or induce Aton's reliance. Again, Aton's obligation as the appealing party is to " 'direct the court to *evidence* that supports [its] arguments' " and "explain how [its cited authority] applies in [its] case." (*Dinslage*, *supra*, 5 Cal.App.5th at p. 379.)  It is not our duty to " 'comb through the record for evidentiary items to create a disputed issue of material fact.' " (*Ibid.*)  Aton's failure to properly support its second and third arguments with citations to record evidence results in forfeiture of both points.

Aton's fourth argument is that United has a duty "to accurately provide the payment reimbursement rate when it voluntarily agrees to do so." Its fifth argument makes the related point that "triable issues of fact remain whether representations concerning the rate of percentage promised were accurate" given that "at minimum, reimbursement at 50[ percent] was promised." In support of the latter argument, Aton cites testimony from a United representative regarding the interpretation of language of a particular insurance plan. Simply put, the cited testimony does not support Aton's factual assertion. We also agree with United's contention that the trial court's unchallenged judicial estoppel ruling applies, and as a result, Aton is foreclosed from attempting to revive its claims by relying on evidence of "what the policies and/or plans may set as the payment rate." We thus reject Aton's fourth and fifth arguments. In sum, we conclude Aton has failed to establish that the trial court erred by summarily adjudicating its causes of action for intentional misrepresentation, negligent misrepresentation, and fraudulent inducement.

## V.

### *Violation of the UCL*

The last cause of action disposed of on summary judgment was Aton's cause of action for violation of the UCL. "Business and Professions Code section 17200 et seq. prohibits unfair competition, including unlawful, unfair, and fraudulent business acts. The UCL covers a wide range of conduct. It embraces ' " ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' " ' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143, fn. omitted.) Because the UCL " 'is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent.'

44

[Citation.] An act can be alleged to violate any or all of the three prongs of the UCL—unlawful, unfair, or fraudulent." (*Berryman v. Merit Property Management, Inc.* (2007) 152 Cal.App.4th 1544, 1554.) However, the remedies available for violation of the UCL are limited. Only equitable remedies can be obtained; damages cannot be recovered. (*Korea Supply Co.*, at p. 1144.)

The trial court ruled that Aton's cause of action for violation of the UCL failed for a number of reasons. It found that Aton could not maintain its UCL claims, which were equitable in nature, because it had an adequate remedy at law—its other causes of action for which it sought money damages, which the court ruled was "true even if the plaintiff's non-UCL claims ultimately fail." It also found that United had succeeded in demonstrating that Aton could not establish that United actually engaged in any unlawful, unfair, or fraudulent business act or practice.

On appeal, Aton challenges the trial court's ruling only insofar as it held Aton could not establish the fraud prong of its UCL claim. Aton asserts that if this court reverses the summary adjudication of its intentional misrepresentation or fraudulent concealment causes of action, we "must likewise reverse judgment on the UCL claim." We are not reversing the court's summary adjudication of Aton's intentional misrepresentation or fraudulent concealment causes of action, so Aton's UCL claim cannot be revived on the basis of the asserted merit of those causes of action.

Next, Aton contends fraud was sufficiently established because it "alleges a . . . continuing pattern of conduct by United in underpaying claims" which creates a financial risk for patients as well as the potential for relapse. This argument runs afoul of the summary judgment statute, which provides that a party opposing summary judgment may not "rely upon the allegations

45

or denials of its pleadings to show that a triable issue of material fact exists[.]" (Code Civ. Proc., § 437c, subd. (p)(2).)

Finally, Aton asserts that it "should be allowed to plead claims for both monetary damages under the fraud claims and injunctive relief as alternative remedies." However, even if the opportunity to amend the complaint remained available at this late juncture, the trial court ruled that Aton's UCL claim fails for reasons independent of concerns about Aton's ability to seek overlapping legal and equitable remedies. The proposed amendment would not resolve these additional concerns, which are fatal to the viability of its UCL claim. (See *Vailette v. Fireman's Fund Ins. Co.* (1993) 18 Cal.App.4th 680, 685 ["leave to amend should *not* be granted where . . . amendment would be futile"].) Aton thus fails to establish that the trial court erred in granting summary adjudication of its cause of action for violation of the UCL.

## DISPOSITION

The judgment is affirmed. United is entitled to its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)


DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.

46